THE STATE OF OHIO, APPELLANT, *v.* HOMAN, APPELLEE.

[Cite as *State v. Homan* (2000), 89 Ohio St.3d 421.]

(No. 99–1107—Submitted April 26, 2000—Decided August 16, 2000.)

422

424

*Kevin J. Baxter,* Erie County Prosecuting Attorney, and *Mary Ann Barylski,* Assistant Prosecuting Attorney, for appellant.

*Gardner & Kucharski, Mark Gardner* and *Timothy J. Kucharski,* for appellee.

*Donald W. White,* Clermont County Prosecuting Attorney, and *David H. Hoffmann,* Assistant Prosecuting Attorney, urging reversal for *amicus curiae,* Ohio Prosecuting Attorneys Association.

FRANCIS E. SWEENEY, SR., J.   This case presents two issues for our consideration.   First, we are asked to consider whether, in administering field sobriety tests, the police must strictly comply with established, standardized procedures. The second issue concerns R.C. 2945.72(E), which provides that pretrial motions instituted by criminal defendants extend the time within which they must be brought to trial.   Appellant contends that this extension can apply to additional, related charges brought against the defendant after the motion is filed.

For the reasons that follow, we conclude that in order for the results of a field sobriety test to serve as evidence of probable cause to arrest, the police must have administered the test in strict compliance with standardized testing procedures.   We also determine that when a criminal defendant files a pretrial motion and the state later files against the defendant additional, related criminal charges, R.C. 2945.72(E) does not extend the time within which the defendant must be brought to trial on those additional charges.

I

When field sobriety testing is conducted in a manner that departs from established methods and procedures, the results are inherently unreliable.   In an extensive study, the National Highway Traffic Safety Administration[4] ("NHTSA") evaluated field sobriety tests in terms of their utility in determining whether a subject's blood-alcohol concentration is below or above the legal limit. The NHTSA concluded that field sobriety tests are an effective means of detecting legal intoxication "only when:  the tests are administered in the prescribed, standardized manner[,] * * * the standardized clues are used to

---

4.  The NHTSA has been a leader in the study and development of field sobriety testing policy and procedure.   The NHTSA's standardized test manuals form the basis for manuals used by state law enforcement agencies across the country.   Taylor, Drunk Driving Defense (5 Ed.2000), Section 4.3.2.

assess the suspect's performance[, and] * * * the standardized criteria are employed to interpret that performance." National Highway Traffic Safety Adm., U.S. Dept. of Transp., HS 178 R2/00, DWI Detection and Standardized Field Sobriety Testing, Student Manual (2000), at VIII–3. According to the NHTSA, "[i]f any one of the standardized field sobriety test elements is changed, the validity is compromised." *Id.* Experts in the areas of drunk driving apprehension, prosecution, and defense all appear to agree that the reliability of field sobriety test results does indeed turn upon the degree to which police comply with standardized testing procedures. See, *e.g.*, 1 Erwin, Defense of Drunk Driving Cases (3 Ed.1997), Section 10.06[4]; Cohen & Green, Apprehending and Prosecuting the Drunk Driver: A Manual for Police and Prosecution (1997), Section 4.01.

We too have recognized that while field sobriety tests are a potentially effective means of identifying intoxicated drivers, these tests' reliability depends largely upon the care with which they are administered. In *State v. Bresson* (1990), 51 Ohio St.3d 123, 554 N.E.2d 1330, we considered whether a police officer may testify at trial regarding a driver's performance on the HGN test as it pertains to the issue of probable cause. In holding that such testimony is admissible, we stressed the importance of the testing process. We noted that the arresting officer's knowledge of the test, his training, and his ability to interpret his observations are key considerations in determining admissibility. *Id.*, 51 Ohio St.3d at 129, 554 N.E.2d at 1336. Although the only test at issue in *Bresson* was the HGN, we suggested that these strict prerequisites to admissibility would also apply to the other field sobriety tests, including the walk-and-turn and one-leg-stand tests. *Id.*

The small margins of error that characterize field sobriety tests make strict compliance critical. Here, for example, Trooper Worcester's failure to use the full four seconds when checking for the onset of nystagmus, while seemingly trivial, rendered the results of this test unreliable. When a police officer moves the stimulus too quickly, he or she runs the risk of going past the point of onset or missing it altogether. NHTSA Student Manual, at VIII–8.

The HGN test is not the only field sobriety test that requires special care in its administration. With respect to the walk-and-turn test, for example, it is important that the investigating officer have the suspect balance heel-to-toe while listening to his or her instructions on how to perform the test, a step that was omitted by Trooper Worcester. The ability or inability of the suspect to keep his or her balance while simultaneously listening to instructions is an important test clue. NHTSA Student Manual, at VIII–11. Even the seemingly straightforward one-leg-stand test requires precise administration. For instance, a police officer must make sure that the suspect keeps his or her foot elevated for the full thirty-

second duration.  Some intoxicated persons can competently perform the test for up to twenty or twenty-five seconds.  Erwin, at Section 10.04[1].

Although in a number of our DUI cases we adopt a rule of substantial compliance, we find these cases to be inapposite.  Two representative cases, *State v. Plummer* (1986), 22 Ohio St.3d 292, 22 OBR 461, 490 N.E.2d 902, and *State v. Steele* (1977), 52 Ohio St.2d 187, 6 O.O.3d 418, 370 N.E.2d 740, illustrate the important differences between our substantial-compliance cases and the case now before us.

In *Plummer*, we held that the police need only substantially comply with an administrative regulation that required urine specimens to be refrigerated when not in transit or under examination.  Accordingly, a three- to four-hour interval of non-refrigeration did not render the results of a subsequent urinalysis test inadmissible at a DUI trial.  In reaching our holding, we noted that the refrigeration requirement contemplated situations involving longer periods of non-refrigeration than that at issue in *Plummer*.  *Plummer*, 22 Ohio St.3d at 295, 22 OBR at 464, 490 N.E.2d at 905.  We further noted that strict compliance with this regulation would not always be realistic or humanly possible.  *Id.*, 22 Ohio St.3d at 294, 22 OBR at 463, 490 N.E.2d at 905.

Similarly, in *Steele*, we held that strict compliance with Department of Health regulations in regard to breathalyzer testing was not necessary in order for the test results to be admissible at trial.  At issue in *Steele* was a Department of Health regulation that required arresting officers to visually observe the suspect for twenty-minutes prior to testing so as to prevent the suspect from orally ingesting any substance.  We found that this requirement had been fulfilled even though the arresting officer had averted his gaze from the suspect for a few seconds while he exited and walked around his patrol car.  We noted that because there was no evidence to suggest that the suspect had in any way corrupted the test results during the few seconds that the officer had departed, the purpose of the rule had not been undermined.  *Steele*, 52 Ohio St.2d at 190, 6 O.O.3d at 419–420, 370 N.E.2d at 742.

Cases such as *Plummer* and *Steele* are distinguishable from the case at bar.  In the substantial-compliance cases, the minor procedural deviations that were at issue in no way affected the ultimate results.  In contrast, it is well established that in field sobriety testing even minor deviations from the standardized procedures can severely bias the results.  Moreover, our holdings in the substantial-compliance cases were grounded, at least in part, on the practical impossibility of strictly complying with the applicable administrative regulations.  In contrast, we find that strict compliance with standardized field sobriety testing procedures is neither unrealistic nor humanly impossible in the great majority of vehicle stops in which the police choose to administer the tests.

In determining whether the police had probable cause to arrest an individual for DUI, we consider whether, at the moment of arrest, the police had sufficient information, derived from a reasonably trustworthy source of facts and circumstances, sufficient to cause a prudent person to believe that the suspect was driving under the influence. *Beck v. Ohio* (1964), 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142, 145; *State v. Timson* (1974), 38 Ohio St.2d 122, 127, 67 O.O.2d 140, 143, 311 N.E.2d 16, 20. In making this determination, we will examine the "totality" of facts and circumstances surrounding the arrest. See *State v. Miller* (1997), 117 Ohio App.3d 750, 761, 691 N.E.2d 703, 710; *State v. Brandenburg* (1987), 41 Ohio App.3d 109, 111, 534 N.E.2d 906, 908.

In the case *sub judice*, Trooper Worcester, the arresting officer, admitted to having not strictly complied with established police procedure when administering to appellee the HGN and walk-and-turn tests. We nevertheless agree with the court of appeals that the totality of facts and circumstances surrounding appellee's arrest supports a finding of probable cause.

While field sobriety tests must be administered in strict compliance with standardized procedures, probable cause to arrest does not necessarily have to be based, in whole or in part, upon a suspect's poor performance on one or more of these tests. The totality of the facts and circumstances can support a finding of probable cause to arrest even where no field sobriety tests were administered or where, as here, the test results must be excluded for lack of strict compliance.

Prior to stopping appellee's vehicle, Trooper Worcester observed erratic driving on the part of appellee. Upon stopping appellee's vehicle, he observed that appellee's eyes were "red and glassy" and that her breath smelled of alcohol. Appellee admitted to the arresting officer that she had been consuming alcoholic beverages. The totality of these facts and circumstances amply supports Trooper Worcester's decision to place appellee under arrest. See *Mason v. Murphy* (1997), 123 Ohio App.3d 592, 598, 704 N.E.2d 1260, 1263; *State v. Beall* (Mar. 8, 1999), Belmont App. No. 94–B–43, unreported, 1999 WL 148371.

## II

Appellant contends that appellee's motion to suppress tolled the time in which appellee had to be brought to trial on the child endangering charge, which was filed subsequent to the filing of the motion to suppress. We disagree.

Under R.C. 2919.22, driving a motor vehicle while intoxicated with one or more children in the car constitutes child endangering. A violation of this law is a first-degree misdemeanor. R.C. 2919.22(E)(5)(a). A defendant charged with a misdemeanor of the first degree must be brought to trial within ninety days after arrest. R.C. 2945.71(B)(2). This period of time may be extended by "[a]ny period of delay necessitated by reason of * * * motion * * * instituted by the

accused." R.C. 2945.72(E). This extension is strictly construed in favor of the defendant. *State v. Singer* (1977), 50 Ohio St.2d 103, 109, 4 O.O.3d 237, 240, 362 N.E.2d 1216, 1220.

The question presented is whether R.C. 2945.72(E) applies where the filing of the motion precedes the filing of the criminal charge. Because an answer to this question does not appear on the face of the statute, we invoke rules of statutory construction in order to arrive at the legislature's intent. *Symmes Twp. Bd. of Trustees v. Smyth* (2000), 87 Ohio St.3d 549, 553, 721 N.E.2d 1057, 1061. R.C. 1.49 sets forth specific rules of statutory construction, which serve as guideposts for courts to follow in interpreting ambiguous statutes. Included among them are the object sought to be attained by the legislature and the consequences of a particular construction. Applying these guideposts, we conclude that tolling was not intended to occur for charges filed subsequent to the defendant's motion filing.

The facts of the instant case are analogous to those in *State v. Adams* (1989), 43 Ohio St.3d 67, 538 N.E.2d 1025. In *Adams,* we held that when a defendant waives his right to a speedy trial as to an initial charge, this waiver is not applicable to additional charges arising from the same set of facts that are brought subsequent to the waiver. We attributed our holding in *Adams* to the objective underlying Ohio's speedy trial statutes—that the ability of a defendant to maintain his or her defense not be impaired. *Id.,* 43 Ohio St.3d at 70, 538 N.E.2d at 1028. We noted in *Adams* that knowing and intelligent tactical decisions cannot be made until all of the facts are known by the accused, and this, of course, includes knowing the exact nature of the crimes charged. *Id.*

Here, as in *Adams,* the state's interpretation of Ohio's speedy trial law conflicts with the objective sought to be achieved by the General Assembly. Appellant's proposed construction of R.C. 2945.72(E) provides the state with an incentive to file charges piecemeal, as opposed to bringing all related charges at the same time. The potential prejudice to defendants is manifest. When a defendant is unaware of the precise nature of the crimes charged, he or she cannot make informed and intelligent tactical decisions about motion filings and other matters.

For the foregoing reasons, we conclude that R.C. 2945.72(E) does not apply to charges filed by the state after the defendant's motion is filed. Accordingly, we affirm the judgment of the court of appeals.

*Judgment affirmed.*

MOYER, C.J., ROCCO and PFEIFER, JJ., concur.

ROCCO, J., concurs separately.

COOK and LUNDBERG STRATTON, JJ., concur in judgment and dissent in part.

Douglas, J., dissents.

Kenneth A. Rocco, J., of the Eighth Appellate District, sitting for Resnick, J.

---

**Rocco, J., concurring.** I agree with the majority that field sobriety test results can provide probable cause to arrest only if the administering officer strictly complies with the standardized testing procedures. I write separately to emphasize an additional point.

I would extend the court's holding here to explicitly state that field sobriety test results are admissible at trial only if the officer strictly complied with standardized testing procedures. The majority has demonstrated that the care with which a field sobriety test is administered has a decisive effect on the test's reliability, and hence its evidentiary value. It seems self-evident to me that if strict compliance with testing procedures is necessary to demonstrate probable cause to arrest, it becomes even more necessary if the tests are to be used to prove guilt.

---

**Lundberg Stratton, J., concurring in part and dissenting in part.** I concur with the majority in that the filing of a motion before an additional charge is brought does not toll the speedy-trial provisions for that charge under R.C. 2945.72(E). Prosecutors should refile applicable motions or require defendant's counsel to refile their motions if the motions also apply to the new charge in order to extend speedy-trial provisions to those later charges.

However, I disagree with the majority's conclusion that field sobriety tests require strict compliance. Field sobriety tests are used by arresting officers to assist in determining whether probable cause exists to arrest the driver for driving under the influence of drugs or alcohol. Field sobriety tests are not constitutionally required, nor are they mandated by statute. They are not even required by the Department of Health or any traffic regulation. They are merely *procedures* established by the National Highway Traffic Safety Administration ("NHTSA"). As such, they are only evidentiary tools.

In 1986, this court examined the level of compliance required in administering regulations concerning storage temperature of urine samples taken from suspected impaired drivers. This court held that "absent a showing of prejudice to a defendant, the results of a urine-alcohol test administered in substantial compliance with Ohio Adm.Code 3701–53–05 are admissible in a prosecution under R.C. 4511.19." *State v. Plummer* (1986), 22 Ohio St.3d 292, 22 OBR 461, 490 N.E.2d 902, syllabus. Because the court required only substantial compliance, rather

than strict compliance, for those regulations, the evidentiary value of the item decreased as substantial compliance decreased. But even at a substantial-compliance level, rather than a strict-compliance level, the test retained strong evidentiary value.

Similarly here, substantial compliance affects the *evidentiary value* of the field sobriety tests. But substantial compliance should not result in the tests' *exclusion*. If *Plummer* only requires substantial compliance with the Ohio Administrative Code for the admissibility of chemical test readings for a strict-liability statute, I would find that only substantial compliance should be required for administering the field sobriety tests in question.

The majority notes that according to the NHTSA, "[i]f any one of the standardized field sobriety test elements is changed, the validity is compromised." National Highway Traffic Safety Adm., U.S. Dept. of Transp., HS 178 R2/00, DWI Detection and Standardized Field Sobriety Testing, Student Manual (2000), at VIII–3. Again, this potential compromise in validity can be challenged by the defense on the basis of reliability. A trial court can conduct a pretrial hearing on whether the tests are sufficiently reliable to be admissible, just as a trial judge conducts similar hearings on other evidentiary issues. Even if the trial judge finds that there was substantial compliance with the field sobriety tests so as to make these tests admissible, defense counsel can still attack the tests' reliability as evidence at trial, depending on the degree of compliance. The NHTSA testing only confirms that the better the compliance, the better the reliability.

The majority highlights *Plummer*'s observation that strict compliance is "not always realistically or humanly possible" regarding urine test regulations. *Id.*, 22 Ohio St.3d at 294, 22 OBR at 463, 490 N.E.2d at 905. However, field sobriety tests are often administered in the dark, on icy roads, on gravel, during wind and rain. Law enforcement officers do not have the ability to select the ideal environment. Thus, so too with field sobriety tests, I believe that strict compliance is not always realistically or humanly possible.

I fear that this ruling will substantially hamper the effectiveness of law enforcement officers in their ability to ascertain probable cause for OMVI arrests. Defense counsel can now attack any minor deviation from the field sobriety tests and seek exclusion of the tests. At a time when more tools are needed in the effort to combat drunk driving, we have greatly reduced the effectiveness of one of those tools, field sobriety tests.

I believe that strict compliance is neither constitutionally nor statutorily mandated, and certainly not mandated by any evidentiary rules. Therefore, I respectfully concur in the judgment, but dissent in part and would find that

substantial compliance, not strict compliance, is the appropriate standard for the admissibility of field sobriety tests.

COOK, J., concurs in the foregoing opinion.

THE STATE EX REL. WALLACE ET AL., APPELLEES, *v.* STATE MEDICAL BOARD OF OHIO ET AL., APPELLANTS.

[Cite as *State ex rel. Wallace v. State Med. Bd. of Ohio* (2000), 89 Ohio St.3d 431.]

(No. 99–1385—Submitted April 11, 2000—Decided August 16, 2000.)

432

*Robert Armand Perez, Sr.,* for appellees.

*Betty D. Montgomery,* Attorney General, *Scott Myers* and *Lisa Wu Fate,* Assistant Attorneys General, and *Mark R. Weaver,* Special Counsel to the Attorney General, for appellants.

ALICE ROBIE RESNICK, J.

This case, which the court of appeals characterized as a "complex case involving the interplay of the Public Records Act, the confidentiality provisions of the State Medical Board of Ohio, and similar, but not identical provisions governing the State Department of Insurance" (footnote omitted), raises two separate yet interrelated issues for our consideration. First, we must determine whether the records in question are "public records" within the meaning of R.C. 149.43. If these records are not public records but rather are confidential investigatory materials, then we must determine whether the presence of a nonagent, third party during witness interviews constitutes a waiver of confidentiality in the otherwise privileged material.

## I. Confidentiality of Investigatory Records

Ohio's Public Records Act is codified in R.C. 149.43 *et seq.* The statute defines "[p]ublic record" as "any record that is kept by any public office." R.C. 149.43(A)(1). The term "public office" includes "any state agency * * * established by the laws of this state for the exercise of any function of government." R.C. 149.011(A). R.C. 149.43 must be construed liberally in favor of broad access to records kept by public offices, and any doubt is to be resolved in favor of disclosure of the records. *State ex rel. Gannett Satellite Info. Network, Inc. v.*

*Petro* (1997), 80 Ohio St.3d 261, 264, 685 N.E.2d 1223, 1227, citing *State ex rel. Gannett Satellite Info. Network, Inc. v. Shirey* (1997), 78 Ohio St.3d 400, 401, 678 N.E.2d 557, 559. Additionally, mandamus is the appropriate remedy to compel compliance with R.C. 149.43. R.C. 149.43(C); see, also, *State ex rel. Multimedia, Inc. v. Snowden* (1995), 72 Ohio St.3d 141, 142, 647 N.E.2d 1374, 1377, citing *State ex rel. Steckman v. Jackson* (1994), 70 Ohio St.3d 420, 426, 639 N.E.2d 83, 88–89. With these standards in mind, we now proceed.

### A. Medical Board Records

The Medical Board is a "public office" for the purposes of R.C. 149.43. Former R.C. 4731.22(C)(1), the applicable provision governing Medical Board investigations, stated, "Information received by the board pursuant to an investigation shall be confidential and not subject to discovery in any civil action." 146 Ohio Laws, Part V, 8765. (The current version is codified at R.C. 4731.22[F][5] and is virtually the same.)

In *State Med. Bd. of Ohio v. Murray* (1993), 66 Ohio St.3d 527, 536, 613 N.E.2d 636, 642–643, we held that information contained in the Medical Board's records "is to be kept confidential at all times and is not, under any circumstances, * * * discoverable in a civil action." Based on the plain language employed in R.C. 4731.22, language that we previously deemed a "clear legislative directive," we hold that the Medical Board's investigative records are not public records. *Id.* at 536, 613 N.E.2d at 642.

R.C. 149.43(A)(1) defines "public record" and enumerates exceptions from the definition of "public record" for purposes of the Public Records Act. "Records the release of which is prohibited by state or federal law" are not public records. R.C. 149.43(A)(1)(q), formerly R.C. 149.43(A)(1)(p), 146 Ohio Laws, Part I, 134. In enacting former R.C. 4731.22(C)(1), the General Assembly specifically exempted the Medical Board's investigative records from disclosure under R.C. 149.43.

Having determined that the Medical Board's investigative records are not public records within the meaning of R.C. 149.43, we must now determine whether the Medical Board waived its right to confidentiality by allowing Wilson, a third party, to attend witness interviews.

Former R.C. 4731.22(C)(1) mandated that the board "conduct all investigations and proceedings in such a manner as to protect patient confidentiality. The board shall not make public names or other identifying information about patients unless proper consent is given or a waiver of the patient privilege exists" under R.C. 2317.02(B). 146 Ohio Laws, Part V, 8766. (This mandate remains unchanged in the current version of R.C. 4731.22. See R.C. 4731.22[F][5]. Moreover, this current version requires the board to protect confidentiality not only of patients but also of persons who file complaints with the board.) This provision

contains safeguards designed to protect patient confidentiality in the same manner that the physician-patient privilege protects patient confidences. *State Med. Bd. of Ohio v. Miller* (1989), 44 Ohio St.3d 136, 138, 541 N.E.2d 602, 604. The court of appeals correctly recognized that by allowing Wilson to attend witness interviews, the Medical Board violated its duty to maintain the confidentiality in the information it gathered. We agree that it was improper for the Medical Board to give a private third party access to this information. Thus, the issue remains whether the Medical Board's breach of confidentiality constitutes a waiver.

One physician, Dr. Semertzides, authorized the release of information gathered at an interview attended by Wilson. The court of appeals determined that by signing the release Semertzides waived his privilege of confidentiality with regard to information gathered at his interview. Consequently, the court of appeals directed the trial court to release the records pertaining to Semertzides and to withhold any information concerning anyone else whose privacy rights were implicated. The court ordered that all other records should remain confidential because "[w]ithout a valid waiver from all persons whose privacy rights are implicated, these records may not be disclosed under the Public Records Act."

"Waiver" is defined as a voluntary relinquishment of a known right. See *Chubb v. Ohio Bur. of Workers' Comp.* (1998), 81 Ohio St.3d 275, 278, 690 N.E.2d 1267, 1269, citing *State ex rel. Athens Cty. Bd. of Commrs. v. Gallia, Jackson, Meigs, Vinton Joint Solid Waste Mgt. Dist. Bd. of Directors* (1996), 75 Ohio St.3d 611, 616, 665 N.E.2d 202, 207. Persons may either expressly or impliedly waive statutory provisions intended for their own benefit, but statutory provisions cannot be waived when they are intended for the benefit of others. See *Brannock v. Brannock* (1986), 104 N.M. 385, 386, 722 P.2d 636, 637; see, also, *State v. Ventura* (1999), 101 Ohio Misc.2d 15, 19, 720 N.E.2d 1024, 1027. Moreover, it is a well-settled general principle that no party has the power to waive matters that affect third parties, because the holder of the privilege is the only one who has the power to relinquish it. *Id.*

Several groups have a privilege of confidentiality in the Medical Board's investigative files. *In re Kralik* (1995), 101 Ohio App.3d 232, 236, 655 N.E.2d 273, 275. These groups include patients, physicians who are under investigation, investigation witnesses, and any other persons whose confidentiality right is implicated by a Medical Board investigation. *Id.* The holder of the confidentiality privilege is the one who must waive it before the contents of the Medical Board's investigative files relating to that person may be divulged. *Id.* Hence, when someone who is not authorized to waive the privilege discloses privileged information, the information remains privileged. *State v. Shipley* (1994), 94 Ohio App.3d 771, 775, 641 N.E.2d 822, 825, citing *Powers v. Chicago Transit Auth.* (C.A.7, 1989), 890 F.2d 1355, 1357–1359.

By permitting Wilson to attend Medical Board interviews with witnesses, the Medical Board waived its own confidentiality privilege; however, the Medical Board cannot unilaterally waive others' privileges to confidentiality, because the Medical Board is not the holder of those privileges.

The court of appeals properly ordered an *in camera* review of records pertaining to the interview with Semertzides and the release of those records after they are redacted to protect the confidentiality of anyone else who has not waived the privilege.

### B. Insurance Department Records

The State Department of Insurance is a "public office" for purposes of R.C. 149.43. At issue is R.C. 3901.44, which relates to insurance fraud investigatory records.

Former R.C. 3901.44(A) stated: "All papers, documents, reports, and evidence in the possession of the division of insurance fraud of the department of insurance that pertain to an investigation conducted or authorized by the division are confidential law enforcement investigatory records under section 149.43 of the Revised Code. Notwithstanding such section, the division shall not prohibit public inspection of such records that pertain to an investigation after the expiration of all federal and state statutes of limitations applicable to the particular offense to which the papers, documents, reports, and evidence relate." 142 Ohio Laws, Part III, 4579. (The current version, codified at R.C. 3901.44[B], is substantially the same.)

Former R.C. 3901.44(A)'s explicit reference to R.C. 149.43 requires that the two sections be read in conjunction. "Confidential law enforcement investigatory records" are not public records for purposes of R.C. 149.43. Former R.C. 149.43(A)(1), now R.C. 149.43(A)(1)(h). However, this is not the end of the inquiry. R.C. 149.43(A)(2) defines "confidential law enforcement investigatory records" as "any record that pertains to a law enforcement matter of criminal, quasi-criminal, civil, or administrative nature, *but only to the extent that the release of the record would create a high probability of disclosure of any of the following*:

"(a) The identity of a suspect who has not been charged with the offense to which the record pertains, or of an information source or witness to whom confidentiality has been reasonably promised;

"(b) Information provided by an information source or witness to whom confidentiality has been reasonably promised, which information would reasonably tend to disclose the source's or witness's identity;

"(c) Specific confidential investigatory techniques or procedures or specific investigatory work product;

"(d) Information that would endanger the life or physical safety of law enforcement personnel, a crime victim, a witness, or a confidential information source." (Emphasis added.)

The Insurance Department invites this court to hold that analysis pursuant to R.C. 149.43 is unnecessary because the plain language of R.C. 3901.44 specifically deems insurance fraud investigatory records "confidential law enforcement investigatory records" under R.C. 149.43. We decline to adopt this interpretation.

A two-step analysis is required when exempting records from release under R.C. 149.43(A)(2). *State ex rel. Multimedia, Inc. v. Snowden* (1995), 72 Ohio St.3d 141, 142, 647 N.E.2d 1374, 1377. The first inquiry is whether the record in question is a confidential law enforcement record. The second inquiry is whether releasing the record would create a high probability of disclosure of any of the four categories of information specified in R.C. 149.43(A)(2).

The language employed by the General Assembly in former R.C. 3901.44(A), now (B), answers the first query in the affirmative. In essence, what R.C. 3901.44 does is classify insurance fraud investigatory records as "confidential law enforcement investigatory records" under R.C. 149.43. Thus, the next step is to ascertain whether any of the exemptions in R.C. 149.43(A)(2) apply.

"[E]xceptions to disclosure must be strictly construed against the custodian of the public records, and the burden to establish an exception is on the custodian." *Multimedia*, 72 Ohio St.3d at 142, 647 N.E.2d at 1377, citing *State ex rel. James v. Ohio State Univ.* (1994), 70 Ohio St.3d 168, 169, 637 N.E.2d 911, 912; see, also, *State ex rel. Gannett Satellite Info. Network, Inc. v. Petro* (1997), 80 Ohio St.3d 261, 266, 685 N.E.2d 1223, 1228; *State ex rel. McCleary v. Roberts* (2000), 88 Ohio St.3d 365, 370, 725 N.E.2d 1144, 1148–1149. Our duty requires us to strictly construe confidential law enforcement investigatory records and "resolve any doubts in favor of disclosure." *Multimedia*, 72 Ohio St.3d at 143, 647 N.E.2d at 1378. Generally, in the absence of evidence that the custodian of the records disclosed their contents to the public, the exemptions are fully applicable. *Petro*, 80 Ohio St.3d at 265, 685 N.E.2d at 1227; see, also, *State ex rel. WLWT–TV5 v. Leis* (1997), 77 Ohio St.3d 357, 361, 673 N.E.2d 1365, 1369–1370.

Application of a statutory exemption to a particular document is best accomplished by an *in camera* inspection. See *Henneman v. Toledo* (1988), 35 Ohio St.3d 241, 243, 520 N.E.2d 207, 210. Based on the limited record before us, we are unable to discern the nature of the records at issue. Consequently, the trial court is the tribunal best equipped to inspect these documents *in camera*, to determine whether their release "would create a high probability of disclosure" of any of the material specified in R.C. 149.43(A)(2), and to withhold any information that falls within a statutory exemption. After examination of the investigatory files, material that does not fall within an exemption must be disclosed upon a request made pursuant to R.C. 149.43, and any exempted information should be

withheld. See *Franklin Cty. Sheriff's Dept. v. State Emp. Relations Bd.* (1992), 63 Ohio St.3d 498, 589 N.E.2d 24, paragraph one of the syllabus.

Having concluded that a two-part inquiry is required in order to determine whether insurance fraud investigatory records, which R.C. 3901.44 designates "confidential law enforcement investigatory records" for purposes of R.C. 149.43, are exempted from release, we now turn to the question of whether the Insurance Department waived its right to rely on any applicable exemptions.

R.C. 149.43's exemptions are "usually fully applicable absent evidence that the public office having custody of the records disclosed the records to the public." *Petro*, 80 Ohio St.3d at 265, 685 N.E.2d at 1227. Wilson, an investigator employed by Anthem, was present at several witness interviews conducted by Kaising. During the investigation of the appellees, Wilson attended these interviews as a representative of Anthem and brought with him a working knowledge of the insurance industry and his employer. At no time during his investigation of the appellees did Kaising share or disclose the contents of the Insurance Department's investigatory file with Wilson. Investigations into insurance fraud are not conducted in a vacuum. Investigators working for private insurance companies may have occasion to interact with investigators from the Insurance Department. As a matter of fact, R.C. 3999.42, which went into effect in March 1998, requires that insurers having a "reasonable belief that a person is perpetrating or facilitating an insurance fraud * * * notify the department of insurance." Although Wilson is a member of the public, his presence at witness interviews conducted by the Insurance Department is not tantamount to a public disclosure and does not effectuate a waiver of any applicable statutory exemptions.

Thus, the court of appeals properly remanded this cause so that the trial court could conduct an *in camera* inspection of the records in question.

## II. Conclusion

The Public Records Act serves a laudable purpose by ensuring that governmental functions are not conducted behind a shroud of secrecy. However, even in a society where an open government is considered essential to maintaining a properly functioning democracy, not every iota of information is subject to public scrutiny. Certain safeguards are necessary. Accordingly, we affirm the court of appeals and remand this cause to the trial court for further proceedings not inconsistent with this opinion.

*Judgment affirmed*
*and cause remanded.*

MOYER, C.J., DOUGLAS, F.E. SWEENEY and PFEIFER, JJ., concur.

COOK and LUNDBERG STRATTON, JJ., concur in part and dissent in part.

COOK, J., concurring in part and dissenting in part. I agree that the Medical Board's investigative records are not public records and that the Medical Board waived its own—and only its own—confidentiality privilege with respect to the Medical Board records discussed in Part IA of the majority opinion.

I respectfully dissent, however, from the majority's judgment that the insurance department records discussed in Part IB might be subject to public disclosure under the Public Records Act. Former R.C. 3901.44 explicitly categorizes the insurance department documents at issue as "confidential law enforcement investigatory records [and thereby excepted from public disclosure as 'public records'] under section 149.43," which precludes the judiciary from reaching a contrary result. The majority analyzes the applicability of the "confidential law enforcement investigatory records" exception and concludes that it does not apply, when the statute plainly states otherwise.

We are not privileged to ignore the plain and unambiguous language of a statute. *State v. Krutz* (1986), 28 Ohio St.3d 36, 38, 28 OBR 96, 97, 502 N.E.2d 210, 211. To hold as the majority does is to do just that.

LUNDBERG STRATTON, J., concurs in the foregoing opinion.

---

LUNDBERG STRATTON, J., concurring in part and dissenting in part. I dissent with respect to whether the presence of a third party at witness interviews constituted a waiver of the State Medical Board's privilege of confidentiality. I also join Justice Cook's dissent and would find that insurance department records are not subject to disclosure under the Public Records Act. I concur as to the remainder of the majority opinion.

Under Part IB of the majority's opinion, "Insurance Department Records," the majority concludes that the presence of Anthem's investigator did not constitute a waiver of the Department of Insurance's privilege of confidentiality. I would apply the same rationale to Part IA and find that the investigator's presence also did not constitute a waiver of the Medical Board's privilege. There is no reason to distinguish between the two.

An insurance fraud investigator is integral to the work of both the Department of Insurance and the Medical Board to uncover fraud or handle allegations of unauthorized medical practice. The investigator possesses the expertise, knowledge, and investigative background that enable the Medical Board and Department of Insurance to determine the direction of their own investigations. At times, there were joint investigations that involved the investigator for the State Medical Board, Patricia Elliss, the Department of Insurance investigator, Robert Kaising, and Anthem's investigator, Richard Wilson. They worked together to gather evidence and interview witnesses.

The allegations being investigated involved issues of fraudulent billing, with complex billing codes and methods. The use of experts, such as Anthem's investigator, is crucial in helping the Medical Board to effectively conduct its investigation. The majority recognizes this importance to the Department of Insurance yet somehow excludes the Medical Board from obtaining the same benefits.

The majority does not address the effect of its decision upon the presence of other third parties; however, the logical extension is that victims and other parties who wish to have a trusted advisor, family member, or friend present at their interview will now waive the confidentiality of their statements. This could affect a victim's willingness to report wrongdoing.

We should hold that the presence of an insurance investigator who is an active participant in the investigation of the wrongdoing at a witness interview does not result in a waiver of the confidentiality of the Medical Board's investigative records.

Therefore, I respectfully dissent.

THE STATE EX REL. OHIO PATROLMEN'S BENEVOLENT
ASSOCIATION ET AL. *v.* CITY OF MENTOR ET AL.

[Cite as *State ex rel. Ohio Patrolmen's Benevolent
Assn. v. Mentor* (2000), 89 Ohio St.3d 440.]

(No. 99–1552—Submitted May 23, 2000—Decided August 16, 2000.)

442

*Climaco, Lefkowitz, Peca, Wilcox & Garofoli Co., L.P.A., Joseph Hegedus* and *Mark J. Volcheck,* for relators.

*Johnson & Angelo, Gary C. Johnson, Thomas L. Colaluca* and *Jeffrey C. Miller*, for respondents.

**Per Curiam.**

*Mandamus: Spetrino Investigative Records*

Relators assert that they are entitled to a writ of mandamus to compel respondents to provide them with access to the Spetrino investigative records under R.C. 149.43, Ohio's Public Records Act. R.C. 149.43 mandates full access to all public records upon request unless the requested records fall within one of the specified exemptions. *State ex rel. Besser v. Ohio State Univ.* (2000), 87 Ohio St.3d 535, 538, 721 N.E.2d 1044, 1047. In fact, public employee personnel records, including personnel records of police officers reflecting discipline, are generally regarded as public records, absent proof of an exemption. *State ex rel. Multimedia, Inc. v. Snowden* (1995), 72 Ohio St.3d 141, 142–143, 647 N.E.2d 1374, 1377–1378.

Respondents claim that the Spetrino records are exempt from disclosure as confidential law enforcement investigatory records under R.C. 149.43(A)(1)(h). R.C. 149.43(A)(1)(h) exempts confidential law enforcement investigatory records from the definition of "[p]ublic record[s]," and R.C. 149.43(A)(2) defines these records to include:

"[A]ny record that pertains to *a law enforcement matter of a criminal, quasi-criminal, civil, or administrative nature, but only to the extent that the release of the record would create a high probability of disclosure of any of the following:*

"(a) *The identity of a suspect who has not been charged with the offense to which the record pertains,* or of an information source or witness to whom confidentiality has been reasonably promised;

"(b) Information provided by an information source or witness to whom confidentiality has been reasonably promised, which information would reasonably tend to disclose the source's or witness's identity;

"(c) Specific confidential investigatory techniques or procedures or *specific investigatory work product;*

"(d) *Information that would endanger the life or physical safety of* law enforcement personnel, *a crime victim, a witness,* or a confidential information source." (Emphasis added.)

The applicability of the R.C. 149.43(A)(2) confidential-law-enforcement-investigatory-record exemption requires, first, that the records pertain to a law enforcement matter of a criminal, quasi-criminal, civil, or administrative nature, and, second, that the release of the records would create a high probability of disclosure of any of the four types of information specified in R.C. 149.43(A)(2).

See *State ex rel. Yant v. Conrad* (1996), 74 Ohio St.3d 681, 684, 660 N.E.2d 1211, 1214.

The first requirement is satisfied because the records pertain to a law enforcement matter of a criminal, quasi-criminal, civil, or administrative nature. As in comparable cases, " '[t]he investigation herein was of specific alleged misconduct, not a routine monitoring investigation.' " *Yant,* 74 Ohio St.3d at 684, 660 N.E.2d at 1214, quoting *State ex rel. Polovischak v. Mayfield* (1990), 50 Ohio St.3d 51, 53, 552 N.E.2d 635, 637 (both involving Bureau of Workers' Compensation investigations of bureau employees' alleged misconduct). The Spetrino investigative records were generated by the alleged misconduct of several Mentor police officers specified in Spetrino's citizen's complaint rather than general, routine employment and personnel inquiries ancillary to law enforcement matters. Cf. *State ex rel. Freedom Communications, Inc. v. Elida Community Fire Co.* (1998), 82 Ohio St.3d 578, 581, 697 N.E.2d 210, 214 (community fire company's investigation of alleged sexual assault involving two employees after police closed their separate investigation); *Multimedia,* 72 Ohio St.3d at 143, 647 N.E.2d at 1378 (investigations routinely conducted and part of personnel records of each police recruit).

And even if the internal affairs investigation of the Spetrino complaint were considered routine, there is no automatic, *per se* exclusion of all routine police criminal investigations from the first step of the R.C. 149.43(A)(2) definition of confidential law enforcement investigatory record. *State ex rel. Natl. Broadcasting Co. v. Cleveland* (1991), 57 Ohio St.3d 77, 80, 566 N.E.2d 146, 149.

For the second requirement of the record exemption, respondents claim that release of the Spetrino investigative records would create a high probability of disclosure of specific investigatory work product under R.C. 149.43(A)(2)(c), information that would endanger the life or physical safety of a witness under R.C. 149.43(A)(2)(d), and the identity of an uncharged suspect under R.C. 149.43(A)(2)(a). Respondents also assert that relators are not entitled to access to the records because the investigation is ongoing and not yet completed.

Exempt work product is information assembled by law enforcement officials in connection with a *pending* or *highly probable* criminal proceeding. *State ex rel. Gannett Satellite Info. Network, Inc. v. Petro* (1997), 80 Ohio St.3d 261, 266–267, 685 N.E.2d 1223, 1228. Investigative materials do not constitute work product when it is not evident that a crime has occurred, because the records are then compiled by law enforcement officials in part to determine if any crime has occurred and not necessarily in anticipation of litigation. *State ex rel. Leonard v. White* (1996), 75 Ohio St.3d 516, 518, 664 N.E.2d 527, 529.

Based on these standards, the work-product exemption does not apply to the Spetrino investigative records. No criminal proceeding resulting from the Spe-

trino investigation was either pending or highly probable when relators requested access to the investigative records. *Id.; Cleveland Police Patrolmen's Assn. v. Cleveland* (1996), 110 Ohio App.3d 796, 801–802, 675 N.E.2d 501, 504; see, also, *State ex rel. Glover v. Lashutka* (Dec. 31, 1996), Franklin App. No. 96APD10–1433, unreported, 1996 WL 751548, applying *Leonard* to hold that "[t]he fact that this investigation could lead to civil and/or criminal proceedings, however, is not sufficient to bring it under the R.C. 149.43(A)(2)(c) exception for 'specific investigatory work product.'" The sealed investigative records indicate that crimes may not have occurred. In fact, respondents concede that, even when they filed their merit brief, "a possibility exist[ed] that formal charge[s] w[ould] not be sought."

The R.C. 149.43(A)(2)(d) witness-endangerment exemption is also inapplicable. As respondents admit, "the record does not indicate a high probability of danger to the life or physical safety of a witness."

Moreover, to the extent that respondents claim that the records are exempt because the investigation concerning the Spetrino matter is still ongoing, R.C. 149.43 does not contain an "ongoing investigation" exemption for public records. See *Yant*, 74 Ohio St.3d at 683–684, 660 N.E.2d at 1213–1214 (relator is entitled to investigative records despite public office's claim that investigation had been "reopened").

Nevertheless, the evidence establishes that the Spetrino investigative records are exempt to the extent that their release would reveal the identities of uncharged suspects under R.C. 149.43(A)(2)(a). Respondents' evidence shows that an active criminal investigation is being conducted concerning the Spetrino matter.

Despite the foregoing evidence, relators contend that the uncharged-suspect exemption does not apply to the Spetrino records because of widespread publicity concerning the Spetrino investigation, respondents' failure to claim this exemption until after this mandamus action was initiated, respondents' use of *Garrity* warnings [1] during investigative interviews of police officers, and the absence of pending or highly probable criminal charges.

---

1. The warning given to police officers questioned during the Spetrino investigation provided:

"I wish to advise you that you are being questioned as part of an official investigation of the Mentor Police Department. You will be asked questions specifically directed and narrowly related to the performance of your official duties or fitness for office. You are entitled to all the rights and privileges guaranteed by the laws and the Constitution of this state and the Constitution of the United States, including the right not to be compelled to incriminate yourself. I further wish to advise you that if you refuse to testify or to answer questions relating to the performance of your official duties or fitness for duty, you will be subject to departmental charges which could result in your dismissal from the Mentor Police Department. If you do answer, neither your statements nor any information or evidence which is gained by reason of such statements can be used against you in any subsequent criminal proceedings. However, these statements may be used against you in

Relators' assertions are meritless. The uncharged-suspect exemption may still apply even though the accusation of criminal conduct is already public knowledge. *State ex rel. Master v. Cleveland* (1996), 76 Ohio St.3d 340, 342, 667 N.E.2d 974, 975–976 ("*Master II*"). Here, as in *Master II,* the publicity concerning the investigation did not preclude application of the uncharged-suspect exemption because release of the records would subject suspects to additional adverse publicity and might compromise subsequent efforts to resolve the matter, and respondents have not voluntarily disclosed the records and thereby waived the application of the uncharged-suspect exemption. *Master II,* 76 Ohio St.3d at 342–343, 667 N.E.2d at 976–977; *State ex rel. WLWT–TV5 v. Leis* (1997), 77 Ohio St.3d 357, 361, 673 N.E.2d 1365, 1369–1370; *State ex rel. Strothers v. McFaul* (1997), 122 Ohio App.3d 327, 333, 701 N.E.2d 759, 762–763 (court rejected argument that uncharged-suspect exemption did not apply where identity of suspect had been revealed in pleadings from litigation, a summary released by the sheriff's office, and television newscasts).

Further, respondents' failure to specify the uncharged-suspect exemption as a basis for withholding the Spetrino investigative record until after this action was filed does not prohibit the applicability of the exemption. See *State ex rel. Plain Dealer Publishing Co. v. Cleveland* (1996), 75 Ohio St.3d 31, 34, 661 N.E.2d 187, 190 ("[E]xceptions to disclosure under R.C. 149.43 are not affirmative defenses, and the city's failure to raise the exceptions it now relies on does not prohibit the court from considering them.").

Moreover, the mere fact that police officers interviewed during the Spetrino investigation received *Garrity* warnings did not mean that it could not be a criminal investigation with criminal suspects. *Garrity* precludes the use, in subsequent criminal proceedings against a public employee, only of evidence obtained as a result of that employee's interrogation and does not prevent the use of other investigatory evidence or another employee's interrogation statements in a subsequent criminal proceeding.

In addition, the absence of pending or highly probable criminal charges is not fatal to the applicability of the uncharged-suspect exemption. See *State ex rel. Master v. Cleveland* (1996), 75 Ohio St.3d 23, 29–30, 661 N.E.2d 180, 185–186 ("*Master I*") (uncharged suspect exemption may apply even if work-product exemption does not); *Strothers,* 122 Ohio App.3d at 333–334, 701 N.E.2d at 763.

---

relation to subsequent departmental charges." (Sealed Exs. G and H, P2.) See *Garrity v. New Jersey* (1967), 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562; *In re Civ. Serv. Charges & Specs. Against Piper* (2000), 88 Ohio St.3d 308, 309, 725 N.E.2d 659, 660, fn. 1.