JOURNAL ENTRY AND OPINION
{¶ 1} Defendant-appellant, Robert Key, appeals from a Berea Municipal Court judgment finding him guilty of operating a vehicle while under the influence of alcohol or drugs ("OVI"). For the following reasons, we affirm.
 {¶ 2} On October 21, 2005, Key was cited for OVI, in violation of R.C.4511.19(A)(1)(a); failing to drive within marked lanes or continuous lanes of travel, in violation of R.C. 4511.33; and making an improper lane change without signaling, in violation of R.C. 4511.39. He entered a plea of not guilty to the charges.
 {¶ 3} On March 27, 2006, Key filed a motion to suppress, arguing that there was no reasonable suspicion to stop him, there was no probable cause to arrest him, and the field sobriety tests were not done in substantial compliance with standardized testing procedures. On appeal, however, Key only raises one issue for our review: *Page 3 
 {¶ 4} "Whether the trial court erred in overruling appellant's motion to suppress the results of the field sobriety tests by finding that the field sobriety tests administered by the arresting officer were conducted in substantial compliance with the standardized testing procedures."
 {¶ 5} Thus, this court will focus primarily on the testimony relating to the field sobriety tests, and not on the facts which led up to the stop.
 {¶ 6} Officer James Lally testified for the city of Brookpark. He stated that he had worked for the Brookpark Police Department for eight years. He was hired by Brookpark after he completed a nineteen-week training course at the police academy. As part of his training, he received instruction on how to deal with individuals impaired by alcohol. In addition, in late 1998, after he was hired by the Brookpark Police Department, he took a two-day course on how to conduct field sobriety testing.
 {¶ 7} On October 21, 2005, at approximately 1:18 a.m., Officer Lally was driving eastbound on Snow Road in the city of Brookpark, near the Brookpark Shopping Center. He observed Key weave within his lane of traffic several times, make two improper lane changes, and then make an improper stop in the middle of the road. It was at that point Officer Lally turned on his overhead lights to effectuate a traffic stop. Key "pulled across both of the eastbound lanes into the Taco Bell driveway." There were no lights in the Taco Bell parking lot. *Page 4 
 {¶ 8} As he approached the driver's side window, Officer Lally "noticed that [Key] had a strong smell of an alcoholic beverage about his person and in the vehicle." Officer Lally also noticed that Key's eyes "were red, kind of glossy," he "had a very flushed complextion [sic]," and "when he got his wallet out and started looking for his driver's license, he seemed to be sluggish * * * [h]e seemed to over exaggerate when he was looking for his driver's license."
 {¶ 9} Officer Lally asked Key, while he was still sitting in his vehicle and turning to his left to look at Officer Lally, if he would perform the horizontal gaze nystagmus ("HGN") test. He stated, "I instructed him — I wanted him to follow my finger and to keep his head straight as best he could at that point." Officer Lally explained that he stopped the test because "[K]ey couldn't move his eyes. I didn't go far. I went back to my cruiser." Officer Lally waited for backup to arrive before he asked Key to exit his vehicle.
 {¶ 10} After Officer Walsh arrived to assist, Officer Lally asked Key to exit his vehicle to administer field sobriety tests. Officer Lally explained, "[w]hen [Key] went to open the door, he had a hard time pushing it open. He stepped out and started to trip. He caught himself, and I had him walk over to the sidewalk," which was approximately twenty to twenty-five feet away from the police cruiser. Officer Lally had his "rotating blue light on" and was using his flashlight. There were no headlights or spotlights coming from the police cruiser. *Page 5 
 {¶ 11} Officer Lally conducted the finger-to-nose test, even though it "is not one of the three that are recognized by the State." He explained that he "told [Key] to stand with his feet together with his arms at his sides and to tilt his head back and close his eyes * * * and stand there for approximately two seconds." He then instructed Key to take his left index finger and point it to his nose, and then his right. He said that when Key used his left finger, he touched his nose, but when he used his right, he touched his cheek. Officer Lally then told Key to do it two more times "and he missed them both."
 {¶ 12} Next, Officer Lally had Key perform the one-leg stand. First, he made sure that Key did not have any problems with his legs that would prevent him from standing. He then instructed Key on how to perform the test and demonstrated how to do it. He told Key to "stand with his feet together and arms at his side * * * to take a foot, whichever one he chose, and lift it up approximately six inches off the ground * * * [p]ut that foot up and count to one, one thousand, two one thousand, three one thousand, all the way up to one thousand thrity [sic]."
 {¶ 13} Officer Lally observed Key lift his left foot off of the ground and he said that after approximately three seconds, "[Key] started to fall to his right side. He needed to check his balance. He stumbled to the right. He did check his balance."
 {¶ 14} Officer Lally then administered the walk-and-turn test. He said that he instructed Key on how to perform the test and demonstrated how to do it. He told Key "to place his left foot on the line and put his right foot in front of it and touching *Page 6 
heel to toe and keep his arms at his side." He further instructed Key to "take nine steps, count out loud as he goes heel to toe with his hands out to the side. After he takes nine steps he is going to take three small steps keeping his foot on the line using his other foot to step around the three steps. Once he completes the turn, he will put his foot back in, count nine steps out loud, touching heel to toe, counting out each step." Officer Lally stated that there was no real or imaginary line that was available for Key to follow, so he told him to just use the lines in the sidewalk.
 {¶ 15} Officer Lally observed Key lose his balance while he was listening to the directions for the "walk and turn." Officer Lally stated, "I didn't want the gentleman to fall at that point, so I told him to stand there while I finished explaining." Then Officer Lally testified, "[Key] just walked down like he was just walking down the sidewalk. He didn't count heel to toe. He only took seven steps. When he got to the 7th step he started to stagger and loose his balance to the right because he was falling to his right. He stepped back like he was walking down the sidewalk not touching the other toe. * * * He used his arms to sway. He was just not following directions whatsoever."
 {¶ 16} The final test Officer Lally conducted was the HGN test. Again, he stated that he gave Key the following instructions: to stand with his feet together and keep his hands to his side, to look at the top of the pen, to keep his head straight, and to follow the pen until it stopped. The first time Key attempted it, Officer Lally said that "he started to follow, and then he followed and kept his eyes straight." *Page 7 
Officer Lally asked him to do it again, and "he couldn't follow the pen at all[,] [s]o I stopped the test."
 {¶ 17} The state then introduced State's Exhibit A, the 2000 NHTSA "DWI Detection and Standardized Field Sobriety Testing" manual, which Officer Lally stated was the manual he was trained on to perform field sobriety testing.
 {¶ 18} On cross-examination, Officer Lally admitted that he did not know of the changes that were made to the manual since 2000 and said that he had not received additional training since 1998. He also could not remember the last time he looked at the NHTSA manual, but said it had been years.
 {¶ 19} Defense counsel showed Officer Lally Defense Exhibit 1, "DWI Investigation Field Notes." Officer Lally agreed that he wrote the field notes, but stated that he did not write them during the field sobriety testing. Instead, he wrote them from memory when he got back to the police station. Officer Lally agreed that the investigation field notes were created to allow an officer to take notes during the tests. He also agreed that he did not use the diagrams on the form which allow an officer to do that, nor did he fill in the sections for the one-leg stand or the walk and turn. He admitted that his field notes only reported that he explained the directions to Key, but they did not indicate that he demonstrated the tests to Key. Officer Lally further agreed that the walk and turn requires a straight line, but stated there was not one available. *Page 8 
 {¶ 20} Officer Lally then identified Defense Exhibit 2, "Alcohol Influence Report Form," and explained that he also filled out this form at the police station. He agreed that in the section, "unusual actions," he did not state that Key had trouble locating his license or that he stumbled when he got out of his vehicle.
 {¶ 21} On redirect-examination, Officer Lally testified that although he did not write that Key fumbled with his wallet on the "Alcoholic Influence Report Form," he did note it on the "DWI Investigation Field Notes." He further stated that he also noted that Key stumbled as he exited his vehicle on the field notes, even though he did not write it on the "Alcoholic Influence Report Form."
 {¶ 22} At the close of the city's case, Key moved for a Crim.R. 29 acquittal, which the trial court denied.
 {¶ 23} Key presented John Saia, an attorney and certified instructor in standardized field sobriety testing. Saia testified that he was certified in field sobriety testing in 1997, updated in 2000, and became an instructor in 2005. The city stipulated to Saia's qualifications as an expert in field sobriety testing. Saia stated that he was in court when Officer Lally testified.
 {¶ 24} Saia explained that the NHTSA funded several studies in the 1970's and found that three of the tests, if performed or administered in strict compliance with the regulations, had a probability over fifty percent of determining if someone was over the legal limit of alcohol in their system. *Page 9 
 {¶ 25} Saia testified that since Officer Lally was trained in 1998, the NHTSA manual has been revised four times; in 2000, 2002, 2004, and 2006. Saia stated that Officer Lally was not utilizing the current standards issued by the NHTSA. He explained that the revisions in the manual deal with the instructions an officer must give the suspect with respect to the walk and turn and the one-leg stand. Saia stated that even in the 2000 NHTSA manual, the instructions have to be given verbatim or the probability indicators that someone is legally over the limit will not be as accurate.
 {¶ 26} Saia testified that the finger to nose test is "not a reliable predictor of whether or not someone would test over a .08 or a .10."
 {¶ 27} As for the HGN test, Saia explained that it can be performed inside of a vehicle, if a person is standing or lying down, as long as the individual looks straight at the officer, with shoulders square to the officer's face, and the individual does not have to turn his or her head. Saia opined that the test Officer Lally conducted while Key was seated in his vehicle was not valid.
 {¶ 28} As for the one-leg stand test, Saia opined that Officer Lally did not administer this test within substantial compliance of the standards. Referring to the notes that he took during Officer Lally's testimony, Saia stated that Officer Lally's failed to inform Key, "do not start to perform this test until I tell you to do so," and then did not ask Key at that point, "[d]o you understand these instructions?" He also failed to instruct Key "[w]hen I tell you to raise one leg six inches above the ground *Page 10 
and keep your raised foot parallel to the ground" (which he explained was an amendment from the 2002 to 2004 manual), nor did he tell Key, "while holding that position count out loud in the following manner; one one thousand, two one thousand, three one thousand, until told to stop."
 {¶ 29} Saia stated that Officer Lally did demonstrate to Key how to perform the one-leg stand. He also properly instructed Key that he should have his toe pointed out, he should keep his arms down at all times, and he did ask Key if he understood the instructions.
 {¶ 30} Saia also testified that Officer Lally did not conduct the walk-and-turn test within substantial compliance of the standards. He stated that the "designated straight line is required for the administration of the test." If there is no designated straight line, "[y]ou can't do the test. The validity of the test is compromised. You cannot reach that 68 percent probability. The results are somewhere between 50, zero, and 68 percent probability."
 {¶ 31} Saia stated that Officer Lally did not properly demonstrate the test, nor did he tell Key, "[d]o not start to walk until told to do so." Instead, Officer Lally instructed Key to "[s]tay in this position until I tell you again." Saia explained that "again" is not the full instruction. Officer Lally also did not ask Key if he understood the instructions "thus far." Saia stated Officer Lally asked Key that at the end, but did not ask him at the point in the testing when he was supposed to ask him. *Page 11 
 {¶ 32} Saia further explained that the next instruction that was supposed to be given to Key was not given. Saia stated: "Mr. Key was told to take the nine heel to toe test steps and a demonstration followed by a turn, and the nine heel to toe steps back. But there was never this specific instruction given with any type of demonstration whatsoever, just giving three heel to toe steps. The officer indicated that he demonstrated the turn, and took nine steps back." Saia also said that Officer Lally "indicated that he demonstrated the turn without indicating how to turn."
 {¶ 33} In addition, Saia explained that Officer Lally failed to give the next instruction to Key, "while you are walking keep your arms down at the side." He failed to tell Key to count his steps out loud and failed to give the next instruction, "[w]hen you start walking don't stop until you complete the test." Saia stated that it was important to give this last instruction because that is one of the indicators or clues "that can be implicated if you stop taking the test."
 {¶ 34} Finally, Saia testified that Officer Lally should have completed the field notes as the field sobriety testing was being done, not at the police station. He stated, "[i]t is important to take very specific notes to indicate, for example, walk and turn test when someone steps off the line (inaudible). Because of the situation, you might get an hour or so down the road before * * * you are filling out this form." He explained that an officer cannot wait an hour to fill out the form because "the tests are very specific. Unless you have a very good memory, it is impossible to do." *Page 12 
 {¶ 35} On cross-examination, Saia was asked to compare the 2000 version of the NHTSA instructions with the 2004 version. He pointed out that the only difference in the walk-and-turn instructions was one word in the fourth instruction. The prior version, the officer was supposed to say, "Keep this position until I tell you to begin. Do not start to walk until told to do so." In the later version, "keep" was changed to "maintain." Other than that, the instructions were identical.
 {¶ 36} Saia also agreed that if one of the instructions was not given by the officer, there were no studies to show that the probability of percentages goes down. Saia stated that based on his experience, most officers in the state of Ohio do not carry NHTSA "cheat sheets" with them; they administer the tests from memory, nor do they give the instructions in the "way that they were trained."
 {¶ 37} The trial court denied Key's motion to suppress, finding that the initial stop was reasonable, there was probable cause to arrest, and the walk and turn and one-leg stand were administered within substantial compliance of the NHTSA manual. The trial court stated that it did not consider the finger-to-nose test or the HGN test and thus, this court will not address them.
 {¶ 38} After the trial court denied his motion to suppress, Key entered a plea of no contest to the OVI charge. It is from this judgment that Key appeals.
 {¶ 39} In his sole assignment, Key maintains only that the trial court erred in finding that the arresting officer substantially complied with the standardized field sobriety testing procedures. He argues that since Officer Lally did not substantially *Page 13 
comply with any of the testing procedures, the trial court should have suppressed all of his testimony concerning the test results.
 {¶ 40} "Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence." (Internal citations omitted.) State v. Burnside,100 Ohio St.3d 152, 2003-Ohio-5372, at ¶ 8. However, with respect to the trial court's conclusion of law, we apply a de novo standard of review and decide whether the facts satisfy the applicable legal standard. Id., citing State v. McNamara (1997), 124 Ohio App.3d 706.
 {¶ 41} In 2002, the General Assembly enacted Am. Sub. S.B. No. 163, amending R.C. 4511.19(D)(4)(b) to read as follows:
 {¶ 42} "In any criminal prosecution * * * for a violation of division (A) or (B) of this section, * * * if a law enforcement officer has administered a field sobriety test to the operator of the vehicle involved in the violation and if it is shown by clear and convincing evidence that the officer administered the test in substantial compliance with the testing standards for any reliable, credible, and generally accepted field sobriety tests that were in effect at the time the tests were administered, including, *Page 14 
but not limited to, any testing standards then in effect that were set by the national highway traffic safety administration, all of the following apply:
 {¶ 43} "(i) The officer may testify concerning the results of the field sobriety test so administered.
 {¶ 44} "The prosecution may introduce the results of the field sobriety test so administered as evidence in any proceedings in the criminal prosecution * * *.
 {¶ 45} "If testimony is presented or evidence is introduced under division (D)(4)(b)(i) or (ii) of this section and if the testimony or evidence is admissible under the Rules of Evidence, the court shall admit the testimony or evidence and the trier of fact shall give it whatever weight the trier of fact considers to be appropriate." (Emphasis added.)
 {¶ 46} In State v. Boczar, 113 Ohio St.3d 148, at ¶ 22-23, the Ohio Supreme Court, upholding the constitutionality of this newly amended provision, explained:
 {¶ 47} "The General Assembly did not encroach on the exclusive rule-making authority of the judiciary in amending R.C. 4511.19. Rather, the new legislation replaced the common-law standard of admissibility announced in [State v. Homan (2000), 89 Ohio St.3d 421]. See State v.Phipps, 3d Dist. No. 2-03-39, 2004-Ohio-4400, at ¶ 13, and Evid.R. 102 (`The principles of the common law of Ohio shall supplement the provisions of these rules'). As the statute indicates, `the trier of fact shall give [the evidence] whatever weight the trier of fact considers to be appropriate.' *Page 15 
 {¶ 48} "The trial judge is the guardian of the admissibility of evidence. Homan was based on test procedures published by the National Highway Traffic Safety Administration, not the constitution, a statute, or even a rule of evidence. This case, however, involves a legislative mandate by which the General Assembly through its deliberative process has concluded that failure to strictly comply with test procedures affects the evidentiary value of field sobriety tests but that substantial compliance will not result in the tests' exclusion. The General Assembly has determined that the tests are sufficiently reliable to be admissible by meeting a clear-and-convincing standard. The potential compromise of reliability caused by the lack of strict compliance can be shown by the defense on cross-examination."
 {¶ 49} The state has the burden to demonstrate that the field sobriety tests were conducted in substantial compliance with the NHTSA standards. See State v. Brown, 166 Ohio App.3d 638, 2006-Ohio-1172, at ¶ 25. See, also, State v. Gasser (1980), 5 Ohio App.3d 217, 219. Part of this burden includes demonstrating what the NHTSA requirements are, through competent testimony and/or introducing the applicable portions of the NHTSA manual. Brown, supra, at TJ19-25, citing State v. Nickelson (July 20, 2001), 6th Dist. No. H-00-036, 2001 Ohio App. LEXIS 3261, at 10 andState v. Ryan, 5th Dist. No. 02-CA-00095, 2003 Ohio 2803, at ¶ 20-21.
 {¶ 50} R.C. 4511.19(D)(4)(b) requires clear and convincing evidence of substantial compliance. The statute, however, does not define "substantial compliance." One court explained: *Page 16 
 {¶ 51} "R.C. 4511.19(D)(4)(b) requires clear and convincing evidence of substantial compliance. What is `substantial compliance?' It is obviously less than strict compliance, but how much less? Since the term is not legislatively defined, courts are apparently left with some discretion to determine the substantiality of the compliance." State v.Perry, 129 Ohio Misc.2d 61, 2004-Ohio-7332, at _25.
 {¶ 52} Since R.C. 4511.19(D)(4)(b) does not define the term, this court must make a determination whether the facts satisfy the substantial compliance standard on a case-by-case basis. State v.Mapes, 6th Dist. No. F-04-031, 2005 Ohio 3359, citing State v.Robinson, 160 Ohio App.3d 802, 2005-Ohio-2280, at _45.
 {¶ 53} Key first argues that the results of the field sobriety testing should have been suppressed because "[t]he only evidence introduced that the tests were conducted in compliance with the established NHTSA standards was the 2000 National Highway Traffic Safety Manual." He maintains that since the manual "has been updated at least three times since the 2000 edition was published," the state did not prove substantial compliance with the current standards.
 {¶ 54} Key's expert testified that the NHTSA manual was revised three times since the 2000 manual; in 2002, 2004, and 2006. Unfortunately, Key did not introduce the most current manual into evidence. Thus, neither the trial court, nor this court could compare the most current standards to the one that was submitted by the city. *Page 17 
 {¶ 55} Key's expert explained that the revisions that have been done in the manual deal with the instructions an officer must give with respect to the walk and turn and the one-leg stand. Key did introduce the "DWI Investigation Field Notes" from the NHTSA's 2004 manual, which included the instructions an officer is supposed to give for each test. Thus, we will compare the 2004 instructions with the 2000 instructions.
 {¶ 56} The 2004 instructions for the walk and turn were:
 {¶ 57} "[1.] `Place your left foot on the line' (real or imaginary). Demonstrate.
 {¶ 58} "[2.] `Place your right foot on the line ahead of the left foot, with the heel of right foot against toe of left foot.' Demonstrate.
 {¶ 59} "[3.] `Place your arms down at your sides.' Demonstrate.
 {¶ 60} "[4.] `Maintain this position until I have completed the instructions. Do not start to walk until told to do so.'
 {¶ 61} "[5.] `Do you understand the instructions thus far?' (Make sure suspect indicates understanding.)
 {¶ 62} "[6.] `When I tell you to start, take nine heel-to-toe steps, turn, and take nine heel-to-toe steps back.' (Demonstrate 3 heel-to-toe steps.)
 {¶ 63} "[7.] `When you turn, keep the front foot on the line, and turn by taking a series of small steps with the other foot, like this.' (Demonstrate.) *Page 18 
 {¶ 64} "[8.] `While you are walking, keep your arms at your sides, watch your feet at all times, and count your steps out loud.'
 {¶ 65} "[9.] `Once you start walking, don't stop until you have completed the test.'
 {¶ 66} "[10.] `Do you understand the instructions?' (Make sure suspect understands.)
 {¶ 67} "[11.] `Begin and count your first step from the heel-to-toe position as `one.'"
 {¶ 68} As testified to by Key's expert, the only difference between the 2000 version of the walk-and-turn instructions and the 2004 version is one word in fourth instruction. In the 2000 version, the officer was supposed to instruct the suspect to "Keep this position * * *." In 2004, it provides that an officer is supposed to "Maintain this position * * *." There were no other changes made to the walk-and-turn instructions.
 {¶ 69} As for the one-leg stand, the 2004 instructions were:
 {¶ 70} "[1.] `Please stand with your feet together and your arms down at the sides, like this.' (Demonstrate.)
 {¶ 71} "[2.] `Do not start to perform the test until I tell you to do so.'
 {¶ 72} "[3.] `Do you understand the instructions so far?' (Make sure suspect indicates understanding.) *Page 19 
 {¶ 73} "[4.] `When I tell you to start, raise one leg, either leg, with the foot approximately six inches off the ground, keeping our raised foot parallel to the ground.' (Demonstrate one leg stance.)
 {¶ 74} "[5.] `You must keep both legs straight, arms at your side.'
 {¶ 75} "[6.] `While holding that position, count out loud in the following manner: one thousand and one, one thousand and two, one thousand and three, until told to stop.' (Demonstrate a count as follows * * *.)
 {¶ 76} "[7.] `Keep your arms at your side at all times and keep watching the raised foot.'
 {¶ 77} "[8.] `Do you understand?' (Make sure suspect indicates understanding.)
 {¶ 78} "[9.] `Go ahead and perform the test.' (Officer should always time the 30 seconds. Test should be discontinued after 30 seconds.)"
 {¶ 79} Key's expert did not testify as to the revisions in the instructions for the one-leg-stand test. According to our review, however, there were three changes made to the one-leg stand instructions from 2000 to 2004. In instruction number 4, the 2000 version read, "`[w]hen I tell you to start, raise one leg, either leg, approximately six inches off the ground, foot pointed out.' (Demonstrate one leg stance.)" In instruction number 6, an "and" was changed to an "a" in the demonstration part of the instructions; "Demonstrate a count as follows * * *." And *Page 20 
instruction number 8, asking if the suspect understood, was not in the 2000 version at all.
 {¶ 80} After reviewing the evidence presented at trial, as well as independently reviewing the revisions made to the instructions from 2000 to 2004, we conclude that they were not significant to show prejudice to Key. Although the NHTSA must have had good reasons to make the minor changes (which would have likely been explained in the manual had Key introduced it), Key did not introduce those reasons into the record, nor did he show how — or even if — the revisions increased the probability of predicting when a person will test over the legal limit of alcohol in his or her system. Therefore, we conclude that Key has failed to show how the revisions prejudiced him and this court will not presume prejudice.
 {¶ 81} Key further argues that the state did not clearly and convincingly prove that Officer Lally substantially complied with the NHTSA guidelines. He maintains that his expert's testimony showed that Officer Lally committed numerous errors when administering the field sobriety tests.
 {¶ 82} Key cites two cases, Gates Mills v. Mace, 8th Dist. No. 84826,2005-Ohio-2191 and Brown, supra, to support his proposition that the city failed to prove by clear and convincing evidence that Officer Lally administered the field sobriety tests in substantial compliance.
 {¶ 83} In Gates Mills, this court specifically pointed out that "the City failed to present any evidence whatsoever to demonstrate that the field sobriety tests were *Page 21 
conducted in either substantial or strict compliance with the NHTSA standards. No witness testified as to these guidelines, and the City didnot introduce the NHTSA manual regarding the tests." (Emphasis added.) Id. at _24. Thus, we held that since the city failed to "prove that the tests were conducted in compliance," the results of the field sobriety tests should have been suppressed. Id. at _26.
 {¶ 84} In Brown, the Eleventh District found that "although [the city] introduced testimony [of the officer] as to which tests were conducted and how they were administered, it failed to produce any evidence to prove the tests were conducted in a standardized manner as provided by the NHTSA, and [it] did not admit the manual." (Emphasis added.) Id. at _25. The court went on to hold that since the city did not prove substantial compliance, the results of the field sobriety tests should have been excluded. Id.
 {¶ 85} We find Gates Mills and Brown to be distinguishable from the case at bar. In this case, the city introduced the NHTSA manual into evidence. Therefore, the trial court could ascertain whether the tests were conducted within substantial compliance of the standards. As for the one-leg stand, Officer Lally testified that he instructed Key to stand with his feet together and keep his arms at his side, to take one of his feet and lift it approximately six inches off the ground and count "one, one thousand, two one thousand, three one thousand, all the way up to one thousand [thirty]." *Page 22 
 {¶ 86} Officer Lally failed to inform Key that he needed to wait to start the test until told to do so, and then failed to ask if him if he understood the instructions at that point. He also failed to tell Key "[y]ou must keep both legs straight" and "keep watching the raised foot."
 {¶ 87} Nevertheless, it is our view that Officer Lally substantially complied with the NHTSA guidelines regarding the one-leg stand. Although not verbatim, he gave Key a majority of the instructions. Officer Lally did not have to strictly comply with the standards.
 {¶ 88} With respect to the walk and turn, Officer Lally admitted that he did not have a straight line for Key to walk on. Key's expert testified that without a real line, the test is invalid. We disagree. Although the walk-and-turn procedure of the 2000 NHTSA manual "requires a designated straight line," the NHTSA instructions contemplate that an officer may need to use an "imaginary" line if a real one is not available in a real life situation. See Walk-and-Turn Instruction No. 1.
 {¶ 89} Key also maintains that Officer Lally failed to demonstrate the test properly because he "only demonstrated three heel to toe steps, not the required nine such steps." The walk-and-turn instructions, however, require an officer to "[d]emonstrate 3 heel-to-toe steps."
 {¶ 90} Officer Lally instructed Key to place his left foot on the line, put his right foot in front of it, touching heel-to-toe, and told him to keep his arms at his side. He told him to take nine steps, and then take three small steps, keeping his foot on the *Page 23 
line and using his other foot to take the take the small steps and turn, and after he completed the turn, to take nine steps back heel-to-toe, counting the steps out loud.
 {¶ 91} Officer Lally did not testify that he asked Key if he understood the instructions. He also did not tell Key "[o]nce you start walking, don't stop until you have completed the test." Reviewing the instructions, however, we conclude that Officer Lally substantially complied with the NHTSA guidelines on the walk-and-turn test.
 {¶ 92} Having concluded that the state presented clear and convincing evidence that Officer Lally substantially complied with the NHTSA guidelines, at least with respect to the one-leg stand and the walk and turn, it is our view that the trial court did not err when it denied Key's motion to suppress the results of the field sobriety tests. Accordingly, Key's sole assignment of error is overruled.
 {¶ 93} The judgment of the Berea Municipal Court is affirmed.
It is ordered that appellee recover from appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Berea Municipal Court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. *Page 24 
 ANTHONY O. CALABRESE, JR., P.J., and MARY EILEEN KILBANE, J., CONCUR *Page 1