OPINION
{¶ 1} Defendant-appellant Craig L. Scott appeals from his conviction and sentence for Operating a Vehicle Under the Influence of Alcohol, under the section of the statute, R.C. 4511.19(A)(1)(h) that proscribes operation with a prohibited level of alcohol in one's breath. Scott pled no contest to this charge after his motion to suppress *Page 2 
the results of a breath test was overruled.
 {¶ 2} Scott contends that evidence was admitted at his suppression hearing in violation of his right to confrontation of witnesses underCrawford v. Washington (2004), 541 U.S. 36, 124 S.Ct. 1354,158 L.Ed. 2d 177; that the State failed to meet its burden of proving that the breath test machine was properly calibrated; that there was not a reasonable and articulable suspicion justifying the administration of field sobriety tests; and that there was no probable cause to arrest him for OMVI. We agree with Scott that the arresting police officer lacked probable cause for the arrest, which led to the obtaining of the breath test result. Accordingly, we conclude that the trial court erred when it overruled Scott's motion to suppress, and the other issues he raises on appeal are moot.
 I {¶ 3} Scott was driving his vehicle eastbound on State Route 725, just east of State Route
 {¶ 4} 741, some time after midnight on October 1, 2006, when he came to the attention of Miami Township Police Officer Shane Duffy. Scott had two passengers. What happened next is described by Duffy as follows:
 {¶ 5} "A. I was assisting Officer Arenoff (phonic) who I believe was on a traffic stop in the Wendy's lot and at that time we both noticed a truck go by, an extended cab truck I believe, heading east bound on 725 with no lights on.
 {¶ 6} ". . . .
 {¶ 7} "Q. And based on those observations of no lights, what did you do if anything? *Page 3 
 {¶ 8} "A. I got in my car and tried to catch up with the vehicle.
 {¶ 9} "Q. Why is that?
 {¶ 10} "A. Because he was driving with no lights on, the roadways were a little wet and the traffic was moderate at that time of night and he had no lights. It was dark.
 {¶ 11} "Q. And ultimately did you catch up with the truck?
 {¶ 12} "A. In the area of Kingsridge Drive, I come across him on 725.
 {¶ 13} "Q. And what did you do?
 {¶ 14} "A. I turned on my lights. He did not immediately pull over. As he approached about the area of O' Charleys he drifted left of center by approximately three feet and kind of maintained that until he got back over for Fridays.
 {¶ 15} "Q. When you say left of center, is there a dividing lines [sic] there?
 {¶ 16} "A. Yes, he was in the inner lane and three foot of his truck was left of center.
 {¶ 17} "Q. And does that indicate anything to you by itself?
 {¶ 18} "A. Yes, well out of lanes is common for impaired or intoxicated drivers to drive like that.
 {¶ 19} "Q. And are you going to make a traffic stop at that point?
 {¶ 20} "A. Yes.
 {¶ 21} "Q. Already determined that?
 {¶ 22} "A. Yes.
 {¶ 23} "Q. Okay, what do you do?
 {¶ 24} "A. I already had my lights on. I was occasionally chirping my siren to get *Page 4 
his attention, but that wasn't working and after a little bit o him [sic] not pulling over, I went ahead and left my siren on. He eventually pulled over directly on top of the I-675 overpass.
 {¶ 25} "Q. About how long was it from when you first hit your lights to when you stopped?
 {¶ 26} "A. I would say that is probably not quite a half mile.
 {¶ 27} "Q. So at this point you have no lights on and marked lanes?
 {¶ 28} "A. Correct.
 {¶ 29} "Q. What happens next?
 {¶ 30} "A. I spoke to the driver. He said that there was a group of persons in the vehicle, they said that they were arguing over the Ohio State game, which that is where they were coming from that day. They all had been drinking and he had a moderate odor of an alcoholic beverage on or about his person. He said that he had three drinks. One at Cheeks, one at the game earlier that day and one at another bar I believe.
 {¶ 31} "Q. And based on that, did you make a determination to get him out for the tests?
 {¶ 32} "A. Yes.
 {¶ 33} "Q. Why is that?
 {¶ 34} "A. To make sure that he was not impaired to drive, to make sure that he was good to go from there.
 {¶ 35} "Q. Did you take him out of the car?
 {¶ 36} "A. Yes.
 {¶ 37} "Q. Okay, what happened? *Page 5 
 {¶ 38} "A. He had an injured right leg I believe it was from a football injury, so he was limping. So my tests were limited, I performed the horizontal gaze nystagmus test.
 {¶ 39} ". . . .
 {¶ 40} "Q. And did you make any observations of his face?
 {¶ 41} "A. I don't recall.
 {¶ 42} "Q. Did you make any observations about his speech?
 {¶ 43} "A. Not that I can remember at this time.
 {¶ 44} "Q. After performing that test [the horizontal gaze nystagmus test], did you make other tests?
 {¶ 45} "A. Yes.
 {¶ 46} "Q. Okay, what did you do?
 {¶ 47} "A. I did what we call a finger/nose test. The person has their feet together or they are standing, they have their head tilted back slightly, their eyes are closed and what they have to do is touch the tip of their nose with arms extended, with their index fingers out.
 {¶ 48} "Q. Is there any kind of specialized training for that kind of test?
 {¶ 49} "A. No.
 {¶ 50} "Q. Okay. Have you performed that test in the past?
 {¶ 51} "A. Yes I have.
 {¶ 52} "Q. And have you used it to indicate whether or not a person is under the influence?
 {¶ 53} "A. Yes. *Page 6 
 {¶ 54} "Q. Okay and in this case, you did that test?
 {¶ 55} "A. Correct.
 {¶ 56} "Q. And how did the defendant perform?
 {¶ 57} "A. On his, I believe it was his right finger, he touched up here on the bridge of his nose. And then the next one, his right finger he touched the tip of his nose and then the next two attempts, he hit the upper lip and then he kind of felt his way up to the nose.
 {¶ 58} "Q. And based on your observations with that test, did he pass or fail?
 {¶ 59} "A. I felt that the [sic] failed that.
 {¶ 60} "Q. And after that what did you do?
 {¶ 61} "A. I placed him in custody for OVI."
 {¶ 62} On cross-examination, the following additional testimony was elicited from Duffy:
 {¶ 63} "Q. And I don't see anything in there, in your report other than the one lane violation you claimed after the over head [sic].
 {¶ 64} "A. Correct.
 {¶ 65} "Q. I am assuming if it is not in your report it wasn't significant enough for you to put it in there, is that fair to say?
 {¶ 66} "A. Yes.
 {¶ 67} "Q. Okay. Did you notice the vehicle drifting at all, like on a straight line out side of it's [sic] lane or anything like that before you put on your overheads?
 {¶ 68} "A. No.
 {¶ 69} "Q. Okay. Did the vehicle have to go through any traffic signals? *Page 7 
 {¶ 70} "A. Yes.
 {¶ 71} "Q. And did it obey those?
 {¶ 72} "A. Yes.
 {¶ 73} "Q. Okay. Did the vehicle almost hit anything?
 {¶ 74} "A. No.
 {¶ 75} "Q. It wasn't accelerating or decelerating rapidly unusually or anything like that?
 {¶ 76} "A. No.
 {¶ 77} "Q. It wasn't braking unusually?
 {¶ 78} "A. No, just not stopping for the overhead lights and siren.
 {¶ 79} "Q. Okay. It wasn't speeding or anything like that?
 {¶ 80} "A. No.
 {¶ 81} "Q. Okay. When the vehicle actually did pull over, it had no difficulty pulling over did it? It didn't strike the curb or anything like that?
 {¶ 82} "A. No.
 {¶ 83} "Q. It didn't pull over in an inappropriate spot, like in the middle of the road or something like that?
 {¶ 84} "A. It pulled off directly on the overhead on I-675.
 {¶ 85} "Q. But you didn't have a problem with that right?
 {¶ 86} "A. At the point we had gone for so far, I was just glad to see him stop.
 {¶ 87} "Q. Well, the area where you put on your overhead lights, you indicated was right around Bravo I think you said, Bravo's restaurant. *Page 8 
 {¶ 88} "A. I thought it was around Kingsridge where I turned on my lights, Kingsridge to O'Charleys, somewhere in there.
 {¶ 89} "Q. Okay. The area of Kingsridge to where the vehicle stopped at I-675, I think that is what about a third of a mile?
 {¶ 90} "A. A third to a half, somewhere in there.
 {¶ 91} "Q. Somewhere in there, no more than a half, probably not even is that fair to say?
 {¶ 92} "A. That is correct.
 {¶ 93} "Q. Okay and the vehicle stopped. You didn't notice anything unusual about the stopping sequence itself, correct?
 {¶ 94} "A. No.
 {¶ 95} "Q. It didn't strike a curb or anything like that?
 {¶ 96} "A. There are no curbs there.
 {¶ 97} ". . . .
 {¶ 98} "Q. Okay. And you approached the driver's side?
 {¶ 99} "A. Yes.
 {¶ 100} "Q. Okay. And did you ask the driver for his driver's license?
 {¶ 101} "A. At one point I did.
 {¶ 102} "Q. Okay, did he have any trouble producing that for you?
 {¶ 103} "A. If he did, I don't recall.
 {¶ 104} "Q. If he did you would have put it in your report?
 {¶ 105} "A. Right. *Page 9 
 {¶ 106} "Q. I am assuming then, if I am looking at your report and I have read it several times and it's not in there, I am assuming that he had no trouble handing it to you.
 {¶ 107} "A. Right.
 {¶ 108} "Q. Did he give you the correct document that you asked for? The license? I mean he didn't hand you like his Elder Beerman charge card or something?
 {¶ 109} "A. I don't recall. It is standard that I ask for license but I don't include it in my report that it was given to me.
 {¶ 110} "Q. Okay, so based on what you remember, there was nothing unremarkable [sic] about him getting out or handing you his license?
 {¶ 111} "A. Correct.
 {¶ 112} ". . . .
 {¶ 113} "Q. That's okay. And the driver, he was at all times cooperative with you, is that right?
 {¶ 114} "A. Yes.
 {¶ 115} "Q. He was polite?
 {¶ 116} "A. Yes.
 {¶ 117} "Q. You didn't notice anything unusual about his speech, correct?
 {¶ 118} "A. No.
 {¶ 119} "Q. It wasn't slurred or mumbled, correct?
 {¶ 120} "A. No.
 {¶ 121} "Q. Okay. Nothing unusual about his answers that he gave? *Page 10 
 {¶ 122} "A. No.
 {¶ 123} "Q. Okay. You didn't notice any alcoholic beverages in the car, nothing like that?
 {¶ 124} "A. No, but there was a definite odor of alcoholic beverage about the vehicle.
 {¶ 125} "Q. You said a moderate odor, correct?
 {¶ 126} "A. Correct.
 {¶ 127} "Q. And there were three other occupants in the vehicle?
 {¶ 128} "A. Yes.
 {¶ 129} "Q. And you determined later that they had consumed some alcohol at some point during the night, correct?
 {¶ 130} "A. Yes.
 {¶ 131} "Q. The occupants?
 {¶ 132} "A. Yes.
 {¶ 133} "Q. Okay. He had good ability to follow your instructions throughout, did he not?
 {¶ 134} "A. Yes.
 {¶ 135} "Q. You feel that he understood what you were telling him?
 {¶ 136} "A. Our tests were limited due to his injury.
 {¶ 137} "Q. I understand. But he had no trouble understanding you correct?
 {¶ 138} "A. Correct. *Page 11 
 {¶ 139} "Q. And he responded appropriately to your questions?
 {¶ 140} "A. Yes.
 {¶ 141} "Q. Okay. Some of the things that I am asking you about the driving sequence and what you observed and didn't observe when you pulled over the driver in this case, those are all things that in your training you were taught to look for, correct? There are certain things about the way the vehicle drives that could indicate an impaired driver, is that correct?
 {¶ 142} "A. Correct.
 {¶ 143} "Q. And also certain things that they call the personal contact phase, certain things you smell, hear, observe, those all give you clues as well, correct?
 {¶ 144} "A. Correct.
 {¶ 145} "Q. Okay and those observations would lead you to believe that somebody is impaired, correct?
 {¶ 146} "A. Yes.
 {¶ 147} "Q. And so when those observations aren't present, that would have the opposite effect, correct, that somebody may not be impaired, is that true?
 {¶ 148} "A. It could.
 {¶ 149} "Q. Okay. The driver didn't make any unusual statements to you did he?
 {¶ 150} "A. When asked how much he had to drink, he said that he had a drink at Cheeks and that they were at the Ohio State game earlier that day and that he had a beer there, then he had a drink, they went to another bar and a drink.
 {¶ 151} "Q. And one beer? *Page 12 
 {¶ 152} "A. Yeah.
 {¶ 153} "Q. So he admitted like one beer at three different locations?
 {¶ 154} "A. Correct.
 {¶ 155} "Q. He was very specific was he not at those locations, correct?
 {¶ 156} "A. Initially my impression was that he was trying to figure out how many he had here and how many he had there.
 {¶ 157} "Q. So he was trying to be accurate?
 {¶ 158} "A. Yes.
 {¶ 159} "Q. And he came up and told you three specific locations, correct, that he had had a beer at?
 {¶ 160} "A. I, in talking with him, we were able to come to that conclusion.
 {¶ 161}
 {¶ 162} "Q. Okay. Did you ask him over what period of time that he had had these drinks?
 {¶ 163} "A. He said earlier in the day, his first drink was at the game. And that would lead me to late afternoon is when he started drinking.
 {¶ 164} "Q. Did you ask him about the other two?
 {¶ 165} "A. No, they were coming from one of the bars at that time.
 {¶ 166} "Q. Okay. Now, it says something in your report, when you told him, I imagine, the reason you had stopped him was for the headlights, correct? For no lights being on.
 {¶ 167} "A. Correct. *Page 13 
 {¶ 168} "Q. And the driver had told you, did he not, that he had an automatic headlight function, correct?
 {¶ 169} "A. Correct.
 {¶ 170} "Q. And you are familiar with that function?
 {¶ 171} "A. Yes.
 {¶ 172} "Q. Basically you put it on auto and there is a light sensor and when it gets dark enough the lights automatically come on.
 {¶ 173} "A. Right.
 {¶ 174} "Q. You essentially never have to touch it, correct?
 {¶ 175} "A. Correct.
 {¶ 176} "Q. And he was right about that, correct? It was set on auto?
 {¶ 177} "A. Yes.
 {¶ 178} "Q. You verified that?
 {¶ 179} "A. Yeah.
 {¶ 180} "Q. Okay. Were there any dash lights on in the vehicle?
 {¶ 181} "A. No.
 {¶ 182} "Q. Nothing. Okay, were there any lights on the radio?
 {¶ 183} "A. I could not see the radio.
 {¶ 184} "Q. You could see the speed odometer and odometer [sic]?
 {¶ 185} "A. Yes.
 {¶ 186} "Q. And there were no lights on?
 {¶ 187} "A. Not until I reached in and turned his lights on and then *Page 14 
everything came on.
 {¶ 188} "Q. Okay, you turned it to the on position?
 {¶ 189} "A. Yes.
 {¶ 190} "Q. And then did you turn it back to auto?
 {¶ 191} "A. No.
 {¶ 192} "Q. You just left it on?
 {¶ 193} "A. Correct.
 {¶ 194} ". . . .
 {¶ 195} "Q. Okay. You then asked, I assume at this point you asked the defendant to get out of the car?
 {¶ 196} "A. Correct.
 {¶ 197} "Q. Was he able to do that okay?
 {¶ 198} "A. He was limping.
 {¶ 199} "Q. But that was from an injury he said, correct?
 {¶ 200} "A. Correct.
 {¶ 201} "Q. But other than the [sic] he wasn't stumbling or didn't climb out of the vehicle at all, correct?
 {¶ 202} "A. No.
 {¶ 203} "Q. Okay. He didn't lean on the vehicle for support?
 {¶ 204} "A. I do not recall that.
 {¶ 205} "Q. I assume again, since it is not in your report that it probably didn't happen, correct? *Page 15 
 {¶ 206} "A. Correct.
 {¶ 207} "Q. He didn't fall over?
 {¶ 208} "A. No.
 {¶ 209} "Q. And besides the limp from the injury, he was able to walk okay to the rear of the vehicle where you brought him?
 {¶ 210} "A. Yes.
 {¶ 211} ". . . .
 {¶ 212} "Q. Were you aware that he [Scott] was about six foot eight?
 {¶ 213} "A. Yes.
 {¶ 214} ". . . .
 {¶ 215} "Q. And then the next test [after the horizontal gaze nystagmus test] that you had him do was some kind of finger to nose exercise, correct?
 {¶ 216} "A. Yes.
 {¶ 217} "Q. And there was no other test given after that, correct?
 {¶ 218} "A. No.
 {¶ 219} "Q. Okay, he didn't do any type of alphabet or counting or anything like that?
 {¶ 220} "A. No.
 {¶ 221} "Q. Okay. The finger to nose test, is that a standardized, recognized test?
 {¶ 222} "A. No.
 {¶ 223} "Q. It's not. Can you cite to me any studies or any treatises that *Page 16 
correlates performance on that test to alcohol impairment?
 {¶ 224} "A. Not that I am aware of.
 {¶ 225} "Q. Can you cite me to any studies or anything correlating that test or the results of that test to somebody's likelihood at testing over a certain alcohol limit?
 {¶ 226} "A. No.
 {¶ 227} "Q. So I am assuming then that there are no standardized clues or scoring system on this test, correct?
 {¶ 228} "A. No.
 {¶ 229} "Q. What's a pass and fail?
 {¶ 230} "A. It's basically to see their coordination.
 {¶ 231} "Q. And what is a passing score versus a failing score?
 {¶ 232} "A. It's a judgment call.
 {¶ 233} "Q. Okay, so it's just up to your judgment whether they pass or fail?
 {¶ 234} "A. Yes.
 {¶ 235} ". . . .
 {¶ 236} "Q. Did you instruct him to use the left and then the right or right and then the left, or any particular order?
 {¶ 237} "A. No I told him once he touches his nose, after each attempt I told him, I will ask for left or right and once he touches he can release.
 {¶ 238} "Q. Okay and did you do that?
 {¶ 239} "A. Yes.
 {¶ 240} "Q. And he got the right hand each time, he used the correct hand? *Page 17 
 {¶ 241} "A. He was just real hesitant and slow about it.
 {¶ 242} "Q. Did you tell him not to be hesitant?
 {¶ 243} "A. No.
 {¶ 244} "Q. Okay. Well that's not like one of the clues is it?
 {¶ 245} "A. He was not real fluent in the way that most people normally do it.
 {¶ 246} "Q. Okay. Would you agree with me that most people don't stand around touching their nose all the time, correct?
 {¶ 247} "A. Correct.
 {¶ 248} "Q. It's not a very common thing to do is it?
 {¶ 249} "A. No."
 {¶ 250} In its decision, the trial court held that the State had failed to establish that the horizontal gaze nystagmus test was performed in accordance with standards established by the National Highway Traffic Safety Administration, and ordered that test result suppressed. In all other respects, the trial court overruled Scott's motion to suppress.
 {¶ 251} Scott then pled no contest, was found guilty, and was sentenced accordingly. From his conviction and sentence, Scott appeals.
 II {¶ 252} Scott's Fourth Assignment of Error, which we find to be dispositive, is as follows:
 {¶ 253} "THERE WAS NO PROBABLE CAUSE TO ARREST APPELLANT *Page 18 
FOR OVI CONSIDERING THE TOTALITY OF THE CIRCUMSTANCES."
 {¶ 254} There was a reasonable basis for Duffy to stop Scott, and Scott does not challenge the propriety of the stop. Although there was a conflict in the testimony of Duffy and Scott's witnesses concerning whether Scott was driving with no headlights on, the trial court could reasonably have found Duffy's testimony to be the more credible on this point. This furnished a basis for the stop.
 {¶ 255} Something more than a reasonable and articulable suspicion for a brief, investigatory stop, but less than full-blown probable cause for an arrest, is required to subject a suspect to field sobriety testing, since the administration of field sobriety tests represents an imposition upon a suspect's liberty interests that is intermediate in its onerousness between a brief, investigatory stop and an arrest.State v. Spillers (March 24, 2000), Darke App. No. 1504. Scott does contend that Duffy lacked the extent of probable cause required for the administration of field sobriety tests — it is the basis for his Third Assignment of Error. Although we need not formally decide that issue, in view of our disposition of Scott's Fourth Assignment of Error, we conclude that there is more evidence in this record to support Duffy's suspicion that Scott was operating a motor vehicle while alcohol impaired than there was in State v. Spillers, supra, and that there was, indeed, in view of the totality of the circumstances, a reasonable basis for requiring Scott to perform field sobriety tests, with the intermediate intrusion upon his protected liberty interests represented thereby.
 {¶ 256} But to have arrested Scott required significantly more of a basis than is required for the mere administration of field sobriety tests. The issue is close, which is why we have quoted so extensively from the testimony at the suppression *Page 19 
hearing, but we conclude that when the totality of the circumstances is considered, Duffy lacked probable cause for an arrest.
 {¶ 257} By Duffy's own admission, the fact that Scott's headlights were off
appears to have been attributable to a malfunction of Scott's motor vehicle, rather than Scott's failure to have turned the lights on. Duffy acknowledged, on cross-examination, that the lights were set to automatic, which should have caused them to be on in the absence of daylight. At most, the fact that Scott's headlights were not on might be some evidence of inattention on his part, but because they were set to automatic, he would not have been expecting for them to be off, and the stretch of road upon which he was observed to be driving is in a heavy commercial area, where there is considerable external lighting, not even considering the light of other vehicles upon this well-traveled roadway. Once Duffy recognized that the lights were set to automatic, the fact that they were not on was, under all of these circumstances, negligible evidence that Scott was impaired.
 {¶ 258} Besides the absence of headlights, Duffy had the following circumstances to consider in evaluating whether there was probable cause to arrest Scott for OMVI:
 {¶ 259} 1. Scott had, on one occasion, driven left of center on the roadway;
 {¶ 260} 2. Other than the one instance of going left of center, Scott's driving was impeccable;
 {¶ 261} 3. Scott did not stop at first, but did stop after about a third or a half of a mile;
 {¶ 262} 4. There was a moderate odor of alcohol in the vehicle, with both *Page 20 
Scott and his passengers admitting to having consumed alcohol;
 {¶ 263} 5. Scott, who is 6' 8", admitted to having had three beers, one of which had been consumed at the Ohio State game hours earlier;
 {¶ 264} 6. Scott did not exhibit slurred speech, or other indicia of intoxication or impairment;
 {¶ 265} 7. Scott performed imperfectly, in Duffy's judgment, on a finger-to-nose test that Duffy acknowledged is not a standardized, recognized test, has not been correlated to alcohol impairment, and is not the subject of any objective scoring regimen other than the administrator's personal judgment.
 {¶ 266} We agree with Scott that there is no more basis in this record for finding probable cause than there was in State v. Beagle, Clark App. No. 2002-CA-59, 2003-Ohio-4331, in which we found the evidence insufficient for a finding of probable cause. In that case, the trial court had considered certain field sobriety tests, but we concluded that because they had not been administered strictly in accordance with the National Highway Traffic Safety Administration manual, they could not properly be considered in connection with a finding of probable cause for an arrest, citing State v. Homan (2000), 89 Ohio St.3d 421, 732
N.E.2d 952. State v. Beagle, supra, ¶ 14. In the case before us, the trial court, itself, has rejected the only field sobriety test — the horizontal gaze nystagmus test — administered other than the finger-to-nose test, upon the ground that it was not conducted in strict accordance with the National Highway Traffic Safety Administration manual. In accordance with State v. Homan, therefore, the horizontal gaze nystagmus test may not be considered in determining whether there was probable cause for Scott's arrest. *Page 21 
 {¶ 267} Scott's Fourth Assignment of Error is sustained.
 III {¶ 268} Scott's First, Second and Third assignments of error are as follows:
 {¶ 269} "THE TRIAL COURT ERRED IN ADMITTING THE BREATH MACHINE DOCUMENTS COMPRISING STATE'S EXHIBIT 1 OVER APPELLANT'S OBJECTION BECAUSE THE DOCUMENTS ARE INADMISSIBLE HEARSAY AND VIOLATE DEFENDANT'S CONSTITUTIONAL RIGHT TO CONFRONT THE WITNESSES AND EVIDENCE AGAINST HIM PURSUANT TO CRAWFORD V. WASHINGTON [supra], THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND SECTION 10, ARTICLE I OF THE OHIO CONSTITUTION.
 {¶ 270} "THE STATE FAILED TO MEET ITS BURDEN OF PROOF TO SHOW THE BREATH MACHINE WAS IN SUBSTANTIAL COMPLIANCE WITH OHIO ADMINISTRATIVE CODE 3701-53-04(A) AS SPECIFICALLY CHALLENGED BY APPELLANT IN HIS MOTION TO SUPPRESS, EVEN IF STATE'S EXHIBIT 1 WAS PROPERLY ADMITTED BY THE TRIAL COURT.
 {¶ 271} "THERE WAS NO REASONABLE ARTICULABLE SUSPICION TO DETAIN APPELLANT FOR FIELD SOBRIETY TESTS AFTER STOPPING HIM, RENDERING ALL EVIDENCE OBTAINED AS A RESULT OF THE UNLAWFUL DETENTION INADMISSIBLE."
 {¶ 272} All of these assignments of error are rendered moot by our disposition of Scott's Fourth Assignment of Error. Accordingly, they are overruled as moot. *Page 22 
 IV {¶ 273} Scott's Fourth Assignment of Error having been sustained, and his other assignments of error having been overruled as moot, the judgment of the trial court is Reversed, and this cause is Remanded for further proceedings consistent with this opinion.
BROGAN and DONOVAN, JJ., concur.
Copies mailed to:
Raymond J. Dundes
Marc T. Ross
 Hon. Robert E. Messham, Jr. *Page 1