[Cite as *State v. Ragle*, 2012-Ohio-4253.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO | C.A. No.     25706 |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| ZACHARY L. RAGLE | STOW MUNICIPAL COURT COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No.     2010 TRC 4803 |

DECISION AND JOURNAL ENTRY

Dated: September 19, 2012

MOORE, Presiding Judge.

{¶1}   Defendant-Appellant, Zachary L. Ragle, appeals from the November 2, 2010 sentencing order and the September 29, 2010 order of the Stow Municipal Court denying his motion to suppress.  For the following reasons, we affirm in part, and reverse in part.

I.

{¶2}   In May of 2010, Mr. Ragle was involved in a one-car accident in the City of Tallmadge.  As a result of the accident, he was charged with one count of operating a motor vehicle while under the influence of alcohol ("OVI") in violation of Tallmadge Codified Ordinance ("T.C.O.") 333.01(a)(1)(A); one count of failure to maintain reasonable control in violation of T.C.O. 333.08; one count of operating a vehicle with a prohibited blood alcohol concentration ("BAC") in violation of T.C.O. 333.01(a)(1)(C); and underage possession or consumption in violation of R.C. 4301.69(E).  Mr. Ragle pleaded not guilty to all charges.

{¶3} He then filed a motion to suppress and/or dismiss alleging that (1) the arresting officer lacked probable cause to arrest him for OVI, (2) the injuries he sustained in the accident rendered him unable to consent to a blood draw, and (3) the blood draw was not done in compliance with the Ohio Administrative Code ("OAC") and the applicable Ohio Department of Health Regulations. The trial court held a hearing on the motion and, in denying it, found that (1) there was probable cause to arrest Mr. Ragle for OVI, (2) he voluntarily consented to the blood draw, and there was no Fourth Amendment violation, and (3) the State substantially complied with OAC 3701-53-05, and Mr. Ragle failed to demonstrate any prejudice.

{¶4} Mr. Ragle changed his plea to "no contest" and the trial court found him guilty of all charges. The trial court sentenced him to 180 days in jail, with 174 days suspended upon the conditions that he complete a driver intervention program, serve three days in jail, and obey all laws for one year.

{¶5} On November 29, 2010, Mr. Ragle appealed raising two assignments of error for our consideration. In his first assignment of error, he argued that the trial court erred in denying his motion to suppress because the State failed to prove that his blood was drawn and tested in accordance with the requirements set forth in OAC 3701-53-05(C), (E) and (F). In his second assignment of error, Mr. Ragle argued that there was no probable cause to arrest him for OVI.

{¶6} On November 16, 2011, a majority of this Court issued a decision and journal entry overruling Mr. Ragle's second assignment of error based upon our determination that probable cause existed to arrest him for OVI, and rendering his first assignment of error moot because the BAC count was eliminated by merger with the OVI count.

{¶7} Mr. Ragle filed an application for reconsideration alleging that we erred in (1) vacating his sentence on the BAC count because the State was required to elect the count on

which to move forward, and (2) we erred in concluding that any irregularity with the blood draw is harmless. On February 3, 2012, we granted Mr. Ragle's application for reconsideration, reinstated the appeal, and vacated our November 16, 2011 decision and journal entry.

{¶8} We now address Mr. Ragle's two assignments of error on the merits.

II.

## ASSIGNMENT OF ERROR I

[MR. RAGLE'S] MOTION TO SUPPRESS THE RESULTS OF A BLOOD ALCOHOL TEST SHOULD HAVE BEEN SUSTAINED BECAUSE THE [STATE] FAILED TO PROVE THAT [HIS] BLOOD WAS DRAWN AND TESTED IN ACCORDANCE WITH THE REQUIREMENTS AS SET FORTH IN [OAC] 3701-53-05(C), (E) AND (F).

{¶9} "An appellate court's review of a trial court's ruling on a motion to suppress presents a mixed question of law and fact." (Citation omitted.) *State v. Campbell*, 9th Dist. No. 05CA0032-M, 2005-Ohio-4361, ¶ 6. "The trial court acts as the trier of fact during a suppression hearing, and is therefore best equipped to evaluate the credibility of witnesses and resolve questions of fact." (Citation omitted.) *Id.* This Court will accept the factual findings of the trial court if they are supported by some competent, credible evidence. *See State v. Balog*, 9th Dist. No. 08CA0001-M, 2008-Ohio-4292, ¶ 7, citing *State v. Searls*, 118 Ohio App.3d 739, 741 (5th Dist.1997). "However, the application of the law to those facts will be reviewed de novo." *Balog* at ¶ 7.

{¶10} In his first assignment of error, Mr. Ragle argues that the State failed to prove that his blood was drawn and tested in accordance with regulations set forth in OAC 3701-53-05(C), (E) and (F), and therefore, the results of the blood test should be suppressed.

{¶11} "The General Assembly established the threshold criteria for the admissibility of alcohol-test results in prosecutions for driving under the influence and driving with a prohibited

concentration of alcohol in R.C. 4511.19(D)." *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 9.   R.C. 4511.19(D)(1)(b) states, in relevant part, that "[t]he bodily substance withdrawn under division (D)(1)(b) of this section shall be analyzed in accordance with methods approved by the director of health by an individual possessing a valid permit issued by the director pursuant to section 3701.143 of the Revised Code."   Further, "R.C. 3701.143 requires the director of health to 'determine, or cause to be determined, techniques or methods for chemically analyzing a person's [whole] blood[.]'" *Burnside* at ¶ 9.   Accordingly, those techniques or methods are set forth in OAC 3701-53-05.

{¶12}  OAC 3701-53-05 provides, in relevant part, that:

 (C) Blood shall be drawn with a sterile dry needle into a vacuum container with a solid anticoagulant, or according to the laboratory protocol as written in the laboratory procedure manual based on the type of specimen being tested.

* * *

(E) Blood and urine containers shall be sealed in a manner such that tampering can be detected and have a label which contains at least the following information:

> (1)  Name of suspect;
>
> (2)  Date and time of collection;
>
> (3)  Name or initials of person collecting the sample; and
>
> (4)  Name or initials of person sealing the sample.

(F) While not in transit or under examination, all blood and urine specimens shall be refrigerated.

{¶13}  In *Burnside* at ¶ 24, citing *State v. Brown*, 109 Ohio App.3d 629, 632 (4th Dist.1996), the Supreme Court of Ohio explained the burden-shifting procedure used in challenges to the admissibility of alcohol-test results, stating:

The defendant must first challenge the validity of the alcohol test by way of a pretrial motion to suppress; failure to file such a motion 'waives the requirement

on the [S]tate to lay a foundation for the admissibility of the test results.' After a defendant challenges the validity of test results in a pretrial motion, the [S]tate has the burden to show that the test was administered in substantial compliance with the regulations prescribed by the Director of Health. Once the [S]tate has satisfied this burden and created a presumption of admissibility, the burden then shifts to the defendant to rebut that presumption by demonstrating that he was prejudiced by anything less than strict compliance.

(Internal citations omitted.)

{¶14} First, Mr. Ragle argues that the State failed to demonstrate substantial compliance with OAC 3701-53-05(C) because there was no evidence that his blood was drawn "with a sterile dry needle" and placed "into a vacuum container with a solid anticoagulant."

{¶15} Anna Streator, RN, a nurse at Akron City Hospital, testified on behalf of the State as follows:

* * *

Q: [Nurse] Streator, were you working, do you recall on * * * Saturday May 29, 2010 into Sunday May 30, 2010?

* * *

A: Yes.

* * *

Q: Okay. Now, on that particular day when you are in charge of the floor, do you then do any blood draws requested by the police?

A: Yes.

Q: And on that particular day, according to your review of the medical chart, was there a blood draw taken?

A: Yes.

* * *

Q: Whenever you perform a blood draw at the request of a police officer, do you do it in a particular manner?

A: Yes.

Q. What do you do specifically?

A: Put on a tourniquet, get a sterile white gauze, wet it with water, clean the site and then draw.

Q: You use the water rather than alcohol, is that correct?

A: Yes.

Q: And when you do the draw, is it—what container do you put that in?

A: What the officers provide.

Q: Okay.

A: It's either two gray or two red vials.

* * *

Further, on cross-examination, Nurse Streator testified:

Q: * * *Do the police bring a kit?

A: Yes.

Q. Okay. So in terms of the items in the kit, what do you use in the kit to draw the blood?

A: The two vials they bring.

Q: So the kit contains two vials?

A: Yes.

Q: All right. In terms of the needle, that's something that the hospital has?

A: Right.

* * *

Q: Okay. You mentioned two different types of capsules or vials. I wanted to ask you about that.* * *

A: Sometimes they're red, sometimes they're gray on the top.

Q: Okay. What's the difference?

A: I have no idea.

Q: Were these red or gray?

A: I have no idea.

* * *

Additionally, on redirect, Nurse Streator testified regarding her knowledge of whether the vials

contained a solid anticoagulant as follows:

* * *

Q: [Nurse] Streator, you testified earlier that you weren't familiar with what was in the two vials. Would it be common that they were anticoagulants in there, in the vial?

A: You know, I don't have any idea what's in there.

* * *

{¶16} Officer Eichler, a police officer for the City of Tallmadge, also testified on behalf

of the State regarding the blood test as follows:

* * *

Q: Were you on duty on the late hours of May 29th into the morning hours of May 30th?

A: On May 29th, yes.

* * *

Q: * * * And what steps did you take at that point?

A: After briefly surveying the scene, I left the scene and I went to the police department to get a blood and urine test kit.

Q: Okay: And is that test kit something that's standardized in the police department?

A: Yes, it is.

Q: And to your knowledge, is that test kit acceptable protocol for the Ohio Department of Health Regulations for a blood draw?

A: Yes.

Q: And do you recall—do you do anything in particular when you grab that kit?

A: We have kits that have been put together by the hospital that are sealed in a bag with who put it together along with an expiration date on the bag.

Q: Did you check the expiration date on the bag?

A: Yes.

Q: And do you recall whether it was expired or not expired?

A: It was not expired.

Q: And to your knowledge, * * * do they have anticoagulants within those blood containers?

A: I believe so, yes.

Q: Okay. * * * [D]o they include a needle or just—what do they include?

A: There are two tubes for blood draws, there's one tube for a urine specimen.

Q: And that's all packaged together?

A: Yes, along with the Chain of Custody form.

* * *

On cross-examination, Officer Eichler further testified regarding the blood draw kit:

Q: Okay. How many test kits are laying around the Tallmadge Police Department?

A: We keep them all in our booking area right next to our intoxilyzer. It's in a desk drawer, and there's usually three to four in there.

Q: And who put together the particular test kit that you used on [Mr. Ragle]?

A: I don't know who in particular. I know that Summa Hospital sticker is on it with an expiration date.

Q: Okay. You didn't put the items in the test kit, correct?

A: That's correct.

Q: All right. You understand that it comes from Summa Hospital?

A: Right.

* * *

This is the testimony upon which the State relied to establish compliance with the Ohio Administrative Code regarding the blood draw performed upon Mr. Ragle. As stated above, the State has the burden to demonstrate that it *substantially complied* with OAC 3701-53-05(C) by drawing Mr. Ragle's blood "with a sterile dry needle into a vacuum container with a solid anticoagulant* * *."

{¶17} We look to our recent decision in *State v. Thompson*, 9th Dist. No. 11CA0112-M, 2012-Ohio-2559, for guidance with the present matter. In *Thompson*, a state trooper, a nurse, and a criminalist testified on behalf of the State. The trooper testified that he provided the nurse with the blood draw kit and "witnessed the draw after the two opened the blood draw kit together." *Id*. at ¶ 10. The trooper further testified that the nurse (1) used a nonalcoholic iodine prep swab, (2) opened a package containing a fresh needle, (3) deposited the blood into two tubes from the kits, and (4) placed an evidence seal over each tube. *Id*. Additionally, the nurse testified that, although she could not remember this specific blood draw, she regularly uses the same procedures in practice, such as (1) using a non-alcoholic Povidone iodine prep swab, (2) removing a dry, sterile needle from the supply box, and (3) drawing the blood into the tubes provided by the Ohio State Highway Patrol which contain sodium chloride, a "dry, white powder anticoagulant that preserves the blood* * * and prevents it from clotting." *Id*. at ¶ 11. Finally, the criminalist testified that her lab is certified by the Ohio Department of Health and that "the blood samples her lab receives are immediately placed in secure refrigeration upon their arrival and remain there until testing can occur." *Id*. at ¶ 13-14.

{¶18} In affirming the trial court's denial of Thompson's motion to suppress, we stated:

The testimony in the record supports the conclusion that the State demonstrated substantial compliance. [The nurse] testified that she used an iodine-based, non-

alcohol solution and sterile, dry needle on Thompson before she then transferred Thompson's blood to two vacuum sealed tubes containing a solid anticoagulant and closed the tubes with a tamper-proof seal. [The state trooper] witnessed the blood draw and corroborated [the nurse's] testimony. [The criminalist] testified that she had alcohol and toxicology procedural manuals authored by the director of toxicology at her work station, her lab was certified by the Health Department, she was certified by the Health Department, and her direct supervisor reviews all the results of her testing. She also testified that her lab refrigerates all samples at all times, except when the samples are being tested, and retains the remainder of positive blood samples after testing in semi-permanent storage. The samples were transferred directly from [the nurse] to [the state trooper] to the Ohio State Highway Patrol Crime Lab where they were logged into evidence with unique identifiers and immediately refrigerated.

*Id*. at ¶ 19.

{¶19} In the present matter, Mr. Ragle's attorney questioned Nurse Streator regarding the needle used to draw Mr. Ragle's blood by asking: "[i]n terms of the needle, that's something that the hospital has?" In response, Nurse Streator merely stated "[r]ight." However, the State did not attempt to further elicit any testimony regarding whether the needle was dry and sterile as required by OAC 3701-53-05(C). As to whether Mr. Ragle's blood was drawn into a vacuum container with a solid anticoagulant, the State asked Streator "[w]ould it be common they were anticoagulants in there, in the vial?" Streator responded, "[y]ou know, I don't have any idea what's in there." The State also queried Officer Eichler as to whether the vial contained an anticoagulant. Officer Eichler testified that he believed so. Additionally, the State asked the officer whether he had knowledge regarding whether the test kit used was acceptable protocol for the Ohio Department of Health Regulations for a blood draw. Officer Eichler simply responded, "[y]es." The State did not engage in any additional questioning regarding the needle or the presence of a solid anticoagulant in the vial. Further, the State did not ask any of its witnesses whether the vials contained a "solid anticoagulant" as required by OAC 3701-53-05(C).

{¶20} In *State v. Slates*, 9th Dist. No. 25019, 2011-Ohio-295, ¶ 11, we also addressed whether the State substantially complied with OAC 3701-53-05(A), (B), (C), (E), and (F). We stated that, because Slates' motion to suppress failed to set forth any factual basis in support of this issue, and the fact that Slates challenged "the admissibility of his urine sample, where there is nothing in the record to demonstrate that he provided a urine sample," Slates' "bare bones recitation of the issue was nothing more than a boilerplate challenge which did not notify the State with sufficient particularity of the specific evidence it was obligated to present." *Id.* As such, we indicated that the State "needed only to demonstrate, in general terms, that it substantially complied with the regulations." *Id.*

{¶21} At Slates' suppression hearing, the State presented testimony from a registered nurse, a police officer, and a toxicologist with the Summit County Medical Examiner's Office. *Id.* at ¶ 12, 14. The nurse testified that "he used a brand new, sterile butterfly needle that he removed from its package," and that "all vials are vacuum tubes[.]" *Id.* at ¶ 14. Further, the toxicologist testified that "he provides the blood draw test kits to the [Akron Police Department] and that he puts the kits together to ensure compliance with state requirements." *Id.* Based upon this testimony, we concluded that, "[a]lthough there was no specific testimony regarding an anticoagulant, a vial in a kit which comports to the OAC requirements would necessarily contain an anticoagulant." *Id.*

{¶22} The present matter is easily distinguishable from both *Thompson* and *Slates* because (1) Mr. Ragle's motion to suppress set forth specific challenges regarding the blood draw, including whether the State followed appropriate procedures in collecting and handling his blood sample in accordance with OAC 3701-53-05(C), as well as an allegation that Officer Eichler failed to document the collection time on the blood vial, thus notifying the State with

sufficient particularity of the specific evidence it was obligated to present at the suppression hearing, (2) Nurse Streator's vague testimony regarding the needle did not come close to the level of detailed testimony given by the nurses in *Thompson* and *Slates* regarding the needles used in their blood draws, (3) Nurse Streator admittedly had no idea if the vials contained a solid anticoagulant, whereas the nurse in *Thompson* provided detailed testimony regarding the solid anticoagulant present in the vials, and the nurse in *Slates* provided testimony regarding the vacuum sealed tubes, (4) Officer Eichler only stated that he *believed* the vials contained an anticoagulant, but did not specify that he *knew* this to be true, or that the anticoagulant was solid, (5) Officer Eichler answered "[y]es" to whether he knew if the test kit comported to Ohio Department of Health regulations, but expressed no actual knowledge of who assembled the test kits, and (6) unlike in *Thompson* and *Slates*, the State did not introduce testimony from the individuals responsible for assembling the test kits and/or testing Mr. Ragle's blood in order to demonstrate compliance with State regulations.

{¶23} Therefore, based upon the record before us and our decisions in *Thompson* and *Slates*, we cannot say that the State met its burden to prove that it substantially complied with OAC 3701-53-05(C). As such, the trial court erred in denying Mr. Ragle's motion to suppress the admissibility of the blood testing results. Because we conclude that the State failed to prove that it substantially complied with OAC 3701-53-05(C), we decline to further address Mr. Ragle's arguments with regard to whether the State also failed to prove that it complied with OAC 3701-53-05(E) and (F).

{¶24} Mr. Ragle's first assignment of error is sustained.

**ASSIGNMENT OF ERROR II**

THE ARRESTING OFFICER DID NOT HAVE PROBABLE CAUSE TO ARREST [MR. RAGLE] FOR OVI AND ALL STATEMENTS AND EVIDENCE SEIZED THEREAFTER ARE INADMISSIBLE.

{¶25} In his second assignment of error, Mr. Ragle argues that Officer Eichler did not have probable cause to arrest him for OVI. We disagree.

{¶26} "In determining whether the police had probable cause to arrest an individual for [OVI], we consider whether, at the moment of arrest, the police had sufficient information, derived from a reasonably trustworthy source of facts and circumstances, sufficient to cause a prudent person to believe that the suspect was driving under the influence." *City of Tallmadge v. Barker*, 9th Dist. No. 24414, 2009-Ohio-1334, ¶ 12, quoting *State v. Homan*, 89 Ohio St.3d 421, 427 (2000), superceded by R.C. 4511.19(D)(4)(b) on other grounds as recognized by *State v. Schmitt*, 101 Ohio St.3d 79, 2004-Ohio-37. Additionally, "[e]ven without positive results on field sobriety testing, the totality of the facts and circumstances may support probable cause to arrest for a violation of Section 4511.19(A) of the Ohio Revised Code." *State v. Walters*, 9th Dist. No. 11CA0039-M, 2012-Ohio-2429, ¶ 10. "The amount of evidence necessary for probable cause to suspect a crime is being committed is less evidence than would be necessary to support a conviction of that crime at trial." *Id.*, quoting *State v. McGinty*, 9th Dist. No. 08CA0039-M, 2009-Ohio-994, ¶ 11. "It is necessary to show merely that a probability of criminal activity exists, not proof beyond a reasonable doubt, or even proof by a preponderance of evidence that a crime is occurring." *Walters* at ¶ 10, quoting *McGinty* at ¶ 11.

{¶27} In *Akron v. Norman*, 9th Dist. No. 22743, 2006-Ohio-769, ¶ 12, we stated that R.C. 4511.19(A)(1)(a), "does not necessitate any finding of a certain blood alcohol content to support a conviction, but rather only requires evidence that a defendant was operating a motor

vehicle while impaired by alcohol." We note that the language in R.C. 4511.(A)(1)(a) parallels the language in T.C.O. 333.01(a)(1)(A). As such, probable cause to arrest Mr. Ragle for OVI may exist even if the State failed to substantially comply with the blood testing requirements.

{¶28} In describing the scene of the accident, Officer Eichler testified as follows:

Q: [W]ere you dispatched to a particular location?

A: Yes.

Q: Where were you dispatched to?

A: To the thousand block of Newton Street.

* * *

Q: When you arrived on scene, what did you observe?

A: We had a maroon colored pickup truck. It was probably about 50 feet off the roadway. It appeared to have been coming from the west travelling eastbound, and it had travelled off the left side of the roadway. It struck several trees and the mailbox and struck another tree, which put it sideways.

        * * *

Q: What did you do when you arrived on the scene?

A: When we arrived on scene, we checked on the occupant of the vehicle.

* * *

Q: Was the occupant conscious at that point in time?

A: No, he was not.

* * *

Q: * * * [W]as there anything as you were waiting that you observed inside the cab of the vehicle?

A: There was a case of beer on the floor board. Coors Light Beer.

* * *

{¶29}   Here, Officer Eichler's testimony indicated that Mr. Ragle's truck "had travelled off the left side of the roadway," striking several trees and a mailbox, "which put it sideways." Upon approaching the vehicle, Officer Eichler found Mr. Ragle, unconscious, "[lying] across the driver's seat." Officer Eichler explained that "[h]is seats were down—if you can picture, were down by where the driver's—pedals were for the operation of the vehicle.  He was [lying] across the seat into the passenger side, and his head was [lying] on the passenger door." Officer Eichler observed a case of Coors Light beer inside the truck and also, "a strong odor of alcoholic beverage coming from inside the [truck]."  Additionally, Officer Eichler testified that two cans were missing from the case of beer.  When the EMS arrived and removed Mr. Ragle from the truck, Officer Eichler also observed "a very strong odor of alcoholic beverage coming from [Mr. Ragle's] breath."  Officer Eichler also testified that Mr. Ragle's speech was slurred and that, at the hospital, he also smelled an odor of alcohol.

{¶30}   In its order, the trial court stated that "[b]ased on the accident, the possession of alcohol in the vehicle with some cans missing, a strong smell of an alcoholic beverage and slurred speech of [Mr. Ragle], this Court finds there was probable cause to arrest [Mr. Ragle] for OVI* * * ."

{¶31}   Under the totality of the circumstances, and based upon the record before us, we conclude that the trial court correctly determined that Officer Eichler had probable cause to arrest Mr. Ragle for OVI.

{¶32}   Mr. Ragle's second assignment of error is overruled.

III.

**{¶33}** In sustaining Mr. Ragle's first assignment of error, and overruling his second assignment of error, we vacate Mr. Ragle's conviction for operating a vehicle with a prohibited blood alcohol concentration ("BAC") in violation of T.C.O. 333.01(a)(1)(C), and affirm his convictions for operating a motor vehicle while under the influence of alcohol ("OVI") in violation of T.C.O. 333.01(a)(1)(A), failure to maintain reasonable control in violation of T.C.O. 333.08, and underage possession or consumption in violation of R.C. 4301.69(E). Because we vacate Mr. Ragle's BAC conviction, the issue of merger is moot. We remand to the trial court for further proceedings consistent with this decision.

Judgment affirmed in part,
reversed in part,
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed equally to both parties.

_____
CARLA MOORE
FOR THE COURT


CARR, J.
CONCURS.

DICKINSON, J.
CONCURRING IN JUDGMENT ONLY.

{¶34} I agree that Officer Dennis Eichler had probable cause to arrest Mr. Ragle for operating a vehicle under the influence of alcohol. Mr. Ragle was the sole occupant of a truck that was involved in a one-vehicle crash, his breath smelled strongly of alcoholic beverages, and there was a case of beer in the front area of the truck with him, with some of the cans missing.

{¶35} I also agree that this Court must vacate Mr. Ragle's conviction for operating a vehicle with a prohibited blood alcohol concentration because the court could not sentence him for that crime and for operating a vehicle under the influence of alcohol. As the lead opinion has noted, Officer Eichler cited Mr. Ragle for operating a vehicle "under the influence of alcohol" under Section 333.01(a)(1)(A) of the Codified Ordinances of the City of Tallmadge, Ohio, and for operating a vehicle while having "a concentration of seventeen-hundredths of one per cent or more by weight per unit volume of alcohol in [his] whole blood" under Section 333.01(a)(1)(F). Although the municipal court found him guilty of both offenses, it "merged" the blood-alcohol-content count with the operating-under-the-influence count because they were the "same offense."

{¶36} Under the doctrine of merger, a defendant who has been found guilty of allied offenses may only be sentenced on one of the offenses. *State v. Damron*, 129 Ohio St. 3d 86, 2011-Ohio-2268, ¶17. In this case, even though the trial court merged the blood-alcohol-concentration offense with the operating-under-the-influence offense, it imposed sentences for both offenses. That was error. *Id*. As the Ohio Supreme Court explained in *Damron*, "[t]he imposition of concurrent sentences is not the equivalent of merging allied offenses." *Id*.

{¶37} For purposes of the doctrine of merger, a "conviction" includes both the determination of guilt and the sentence or penalty. *State v. Damron*, 129 Ohio St. 3d 86, 2011-Ohio-2268, ¶ 17. The trial court found Mr. Ragle guilty of operating a vehicle with a prohibited blood alcohol concentration and imposed a sentence on it. Because the court had merged the blood-alcohol-concentration offense with the operating-under-the-influence offense, however, it was not allowed to impose a sentence for the blood-alcohol-concentration offense. Accordingly, I agree that Mr. Ragle's conviction for operating a vehicle with a prohibited blood alcohol concentration must be vacated. I would overrule his first assignment of error as moot.

APPEARANCES:

BRIAN M. PIERCE, Attorney at Law, for Appellant.

PENNY TAYLOR, Director of Law, and MEGAN E. RABER, Assistant Director of Law, for Appellee.